# Illinois Official Reports

## Appellate Court

*People v. Sullivan*, 2014 IL App (3d) 120312

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SCOTT SULLIVAN, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-0312 |
| Filed | March 26, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's conviction for the first degree murder and aggravated battery of a senior citizen, defendant failed to sustain his burden of establishing that the prosecutor's improper comment during closing arguments on the reasonable doubt standard constituted plain error, defense counsel's failure to request an instruction on causation did not amount to ineffective assistance, the appellate court rejected defendant's contention that he was entitled to have a new attorney argue his motion for a new trial because his trial counsel created a *per se* conflict of interest by arguing his own ineffectiveness, and the 30-year sentence for first degree murder was not an abuse of discretion; however, the conviction for aggravated battery of a senior citizen was vacated pursuant to the one-act, one-crime doctrine. |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 11-CF-513; the Hon. Daniel J. Rozak, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |

Counsel on
Appeal

Michael J. Pelletier and Benjamin Wimmer (argued), both of State
Appellate Defender's Office, of Chicago, for appellant.

James Glasgow, State's Attorney, of Joliet (Justin A. Nicolosi
(argued), of State's Attorneys Appellate Prosecutor's Office, of
counsel), for the People.

Panel

JUSTICE McDADE delivered the judgment of the court, with
opinion.
Justices O'Brien and Wright concurred in the judgment and opinion.

## OPINION

¶ 1      Defendant Scott Sullivan was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 2010)) and aggravated battery of a senior citizen (720 ILCS 5/12-4.6(a) (West 2010)). He appeals and argues (1) that his conviction should be reversed because the prosecutor made improper comments regarding the standard of proof beyond a reasonable doubt; (2) that his attorney was ineffective for failing to request a jury instruction on causation; (3) that his attorney had a *per se* conflict of interest during posttrial proceedings; (4) that the trial court imposed an excessive sentence on the first degree murder conviction; and (5) that his conviction for aggravated battery of a senior citizen should be vacated under the one-act, one-crime doctrine.

¶ 2      We affirm defendant's first degree murder conviction and sentence, but vacate his conviction for aggravated battery of a senior citizen.

¶ 3                                    BACKGROUND

¶ 4      Defendant Scott Sullivan was the primary caretaker of his father, 86-year-old Fred Sullivan. Fred suffered from dementia. He lived with defendant and also attended adult day care five days per week. Fred was able to move with the aid of a walker and the assistance of others, and could participate in some physical activities. But he was cognitively impaired, and while he would speak to others, he was unable to carry on long conversations and often became agitated.

¶ 5      On July 18, 2010, paramedics were dispatched to defendant's home in Lockport, Illinois. When they arrived they found Fred severely injured and lying in a pool of blood. Fred had severe facial swelling, a laceration on the back of his head, and abrasions and skin tears on his arms and legs. Defendant told the paramedics that Fred had suffered a fall. The paramedics transported Fred to the hospital, and their supervisor contacted the police.

¶ 6      The emergency room doctor who treated Fred was Dr. George Filiadis. When Fred arrived, he was nonresponsive and had to be intubated and put on a ventilator. Dr. Filiadis described Fred's state as "semicomatose." Given the extensive bruising injuries on Fred's head, Dr.

Filiadis diagnosed Fred with a "close head injury," which is a nonspecific diagnosis indicating brain trauma. He believed that Fred had "too many bruises" to have suffered a simple fall. Dr. Filiadis ordered CT scans and X-rays; these tests did not reveal any fractures or brain bleeds, although Dr. Filiadis stated that a hematoma could have developed from Fred's injuries after the tests were conducted.

¶ 7        In August of 2010, Fred was admitted to the Salem Village nursing home, where he was deemed a "total care." Fred was fed through a feeding tube, was practically immobile and bedridden, and was not able to communicate verbally. On September 14, 2010, Fred fell and struck his head at the nursing home while being bathed by a nursing assistant. Fred died two months later in November 2010. An autopsy revealed a large subdural hematoma in his brain that was months old.

¶ 8        On March 17, 2011, a grand jury returned bills of indictment charging defendant with one count of first degree murder (720 ILCS 5/9-1(a)(2) (West 2010)) and one count of aggravated battery of a senior citizen (720 ILCS 5/12-4.6(a) (West 2010)).[1] In addition to the facts above, the following evidence was adduced at defendant's trial.

¶ 9        The State presented testimony from police officers who questioned defendant after Fred was injured. When Deputy Arthur Huffstuttler arrived at defendant's home on the evening of July 18, 2010, defendant stated that he got out of bed and heard Fred calling for help. Defendant found Fred in the dining room and he pulled him into the living room. Deputy Huffstuttler indicated that he smelled alcohol on defendant that evening. Defendant told police that he was not sure how Fred hurt himself, but that Fred fell often and must have received the injuries in a fall. Defendant stated that he slapped Fred's face that night in an effort to revive him, which might have injured Fred's face, and he might have injured Fred's back and legs while moving him from the dining room.

¶ 10       Defendant's neighbors testified that defendant had grown frustrated with caring for Fred in the months preceding July 2010. The neighbors witnessed defendant physically pulling and dragging Fred inside the home. They could hear defendant insulting and yelling at Fred. They heard defendant say that Fred had ruined his life.

¶ 11       Crime scene investigators took photos of bloodstains on the walls and ceiling of defendant's home. The investigators collected DNA swabs of the bloodstains, and the parties admitted stipulated testimony indicating to a high degree of likelihood that Fred was the source of the blood. Dr. Paul Kish, a bloodstain pattern analyst, examined the bloodstains, which indicated the occurrence of at least four impacts of an object against a human body. He also stated that the bloodstains on the ceiling indicated that blood was cast off from an object while the object was being swung. Based on the bloodstains, Dr. Kish opined that one or two "impact splatter events" occurred in the living room of defendant's home.

¶ 12       Dr. John Scott Denton was a forensic pathologist with the Will County coroner. He testified as an expert in forensic pathology. Dr. Denton reviewed photographs of Fred's injuries and stated that they indicated blunt trauma on his face and head. He also described "pattern" injuries resulting from collisions with objects of various shapes. Dr. Denton opined Fred's facial injuries were not consistent with being slapped in the face. The injuries were also not consistent with a fall because there were too many injuries on different parts of the body and the contours of the injuries were curved, which indicated more than hitting a wall or floor.

[1]A third charge for aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2010)) was dismissed prior to trial.

¶ 13   Dr. Denton conducted an autopsy on Fred on November 15, 2010. The autopsy revealed that Fred had an "extensive" subdural hematoma in the frontal, temporal, and parietal lobes of his brain. This indicated that Fred's brain had been bleeding. Dr. Denton stated that the hematoma had been healing and stated that it was not a recent injury, estimating that it was "months old." With the elderly, any injury to the head can potentially cause a brain bleed. Fred had a condition called hydrocephalous, which also carried an increased risk of brain bleeding.

¶ 14   Dr. Denton also discovered pneumonia and bronchopneumonia in Fred's lungs, which was consistent with fluid aspirating into Fred's lungs. Dr. Denton determined that Fred "died from that bronchopneumonia acutely due to the subdural hematoma and the brain or cerebral injuries due to an assault related to those multiple bruises." He opined that the assault caused the hematoma, which immobilized Fred and created a situation where Fred would aspirate and develop bronchopneumonia. He testified about determining the cause of death:

> "In forensic pathology or forensic medicine, it's basically a causal link. You know, is there a link between the initiating event and does that person suffer injuries that they eventually will die from and is that link unbroken? That is the main criteria.
>
> So with Mr. Sullivan, the injuries were consistent with inflicted trauma or inflicted blunt trauma consistent with some kind of pattern injury, the linear force, and then the curvilinear area. So an object, I believe, caused those injuries from an assault.
>
> Immediately when he went to the hospital, he was in a coma, Mr. Sullivan was in a coma. He was unresponsive.
>
> He suffered severe injuries that put him into a coma where before he was living in a house, he was talking, he was able to walk. Now he suffers injuries that put him into a coma where he is basically dependent on a ventilator. There is a tube breathing–a tube and a machine breathing for him because of his head injuries, and then he basically just continues on without any interruption in that capacity.
>
> He develops aspiration pneumonia in August. He was treated for that. He was aspirating because of a head injury. So he had aspirational pneumonia in August. He was treated with antibiotics.
>
> He never progressed back to his normal level[,] which is another criteria. If a person sustains injuries, they become ill, and they get back to their normal level, then that is a break in the chain; but if he never got back to his normal level, he still continued on in that lower area of dysfunction.
>
> At this level as an 86 year old man, he sustains the injuries, he functions at this level, and he never functions again where he was, that's the criteria for forensic medicine."

¶ 15   Dr. Denton also testified that his opinion did not change even though the initial CT scans following Fred's injuries on July 18, 2010, showed no hematoma. He cited recent studies indicating that CT scans could "miss things about a third of the time." Dr. Denton also testified that he reviewed hospital records from September 2010 after Fred fell at the nursing home. The records indicated Fred suffered a three-centimeter gash above his left eyebrow. A CT scan was conducted at the hospital and there was no evidence of a rebleed. Because Fred's state of functioning was the same both before and after the fall in September 2010, it did not change Dr. Denton's opinion on the cause of death.

¶ 16   The defense called Phillip Oswu, a certified nursing assistant (CNA) at the Salem Village nursing home. Oswu cared for Fred while Fred stayed at Salem Village. He testified that on

September 14, 2010, he and another CNA used a wheelchair to move Fred to the shower for bathing. They placed Fred in a shower chair, and when Oswu turned around to pick up a washcloth, Fred fell forward and hit his head on the floor. Fred sustained a cut on his head and was taken to the hospital.

¶ 17    On cross-examination, Oswu discussed Fred's condition prior to this fall: Fred was confined to bed, and although he could move around in the bed, he was not physically able to walk, he was not able to communicate, and he was fed through a feeding tube. After the fall, Fred was in the same condition. Another nurse at Salem Village, Imani Crudup, also testified that Fred's physical condition appeared to be the same both before and after he fell in the shower.

¶ 18    The defense also presented testimony from defendant's family. Defendant's son, Anthony Sullivan, stated he never witnessed defendant physically or verbally abuse Fred. Anthony knew of prior instances where Fred had suffered falls at the home. Anthony also testified that he visited Fred every other week when Fred was at Salem Village. When he visited, Fred would reach out and touch Anthony's hand and track movement with his eyes. Fred would mumble softly. However, when he visited after Fred fell on September 13, 2010, Fred was not as alert and did not track movements. Defendant's wife, Terry Sullivan, testified that when she visited Fred in early September 2010, he was recovering. But after the fall at the nursing home she never saw Fred awake again.

¶ 19    The case proceeded to closing argument, where the State cited Dr. Denton's testimony to argue that defendant assaulted Fred on July 18, 2010, and that Fred's injuries caused Fred's death because he never returned to his pre-assault level of functioning. The State also made a brief attempt to explain the "beyond a reasonable doubt standard" to the jury. The defense argued in closing that the State had not met its burden. It argued that Fred's injuries could have been sustained in a fall at defendant's home. The defense also argued that it was reasonable to conclude that Fred's intervening fall at the nursing home was the cause of his death.

¶ 20    The jury found defendant guilty of both first degree murder and aggravated battery of a senior citizen. The defense brought a posttrial motion with 18 allegations of error, including an allegation that the court erred by failing to submit a jury instruction on causation. After hearing arguments on the motion, the court summarily denied the motion. The matter proceeded to a sentencing hearing. The trial judge sentenced defendant to serve a 30-year term for the murder conviction concurrently with a 7-year term for the aggravated battery of a senior citizen conviction.

¶ 21    Defendant filed a timely notice of appeal.

¶ 22                                  ANALYSIS
¶ 23                      I. State's Comments on Reasonable Doubt
¶ 24    Defendant's first argument on appeal addresses the State's discussion of reasonable doubt during closing arguments. The prosecutor told the jury:

    "The standard of reasonable doubt is not beyond all doubt or beyond a shadow of a doubt. And you don't get a jury instruction on what reasonable doubt is. That is something you collectively have to decide, what reasonable doubt is and whether we have overcome that burden in proving our case to you."

According to defendant, the prosecutor's statement was an impermissible attempt to define reasonable doubt. Defendant argues that this comment was prejudicial because the prosecutor

effectively told the jury that reasonable doubt meant whatever the jury decided it meant, creating a risk that the jury convicted defendant on proof less than the constitutionally required standard of proof beyond a reasonable doubt.

¶ 25    Defendant did not object to the prosecutor's comment at trial or raise the issue in a posttrial motion. The failure to do so would ordinarily result in forfeiture of appellate review of the issue, but defendant asks that we review this issue under the plain error rule. Under plain error review, we may reach an otherwise forfeited issue if a clear and obvious error occurred and (1) the evidence is closely balanced, or (2) the error "is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). See also *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010) (equating the second prong of plain error review with structural error).

¶ 26    In plain error review, the defendant carries the burden of persuasion, and if the defendant fails to meet that burden, we will honor defendant's procedural default. *People v. Walker*, 232 Ill. 2d 113, 124 (2009). Our first step in plain error review is to determine whether any error occurred at all. *Thompson*, 238 Ill. 2d at 613. Whether the prosecutor's comments during closing arguments constitute reversible error is an issue of law we review *de novo*. See *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007).

¶ 27    "The law in Illinois is clear that neither the court nor counsel should attempt to define the reasonable doubt standard for the jury." *People v. Speight*, 153 Ill. 2d 365, 374 (1992). Our supreme court has cautioned that attempts to explain reasonable doubt pose a danger of "distort[ing] the standard to the prejudice of the defendant." *People v. Keene*, 169 Ill. 2d 1, 25 (1995). Moreover, there is no need for counsel or the trial judge to explain the reasonable doubt standard to a jury, because the concept of reasonable doubt is self-explanatory. See *People v. Wielgos*, 220 Ill. App. 3d 812, 820 (1991) ("[T]here is no better definition of reasonable doubt than the words themselves."). As the State concedes in this case, the prosecutor should not have attempted to explain reasonable doubt during his closing argument.

¶ 28    Accordingly, we must determine whether this error constitutes plain error. Defendant argues that it meets the second prong of the plain error rule, constituting an error so serious it compromised the fairness of defendant's trial. In support of his argument, defendant cites two recent appellate decisions: *People v. Turman*, 2011 IL App (1st) 091019, and *People v. Franklin*, 2012 IL App (3d) 100618. In *Turman*, the trial judge instructed the jury that " 'reasonable doubt is not defined under Illinois law. It is for the jury to collectively determine what reasonable doubt is.' " *Turman*, 2011 IL App (1st) 091019, ¶ 19. The court concluded that this instruction was plain error because the instruction created a risk that the jury "used a lesser standard of doubt than reasonable doubt since they were to collectively determine what the term meant." *Turman*, 2011 IL App (1st) 091019, ¶ 27. In *Franklin*, the trial judge gave a similar instruction, telling jurors "that 'beyond a reasonable doubt' is 'what each of you individually and collectively, as 12 of you, believe is beyond a reasonable doubt.' " *Franklin*, 2012 IL App (3d) 100618, ¶ 20. The *Franklin* court noted that a reasonable doubt instruction is constitutionally deficient if it creates a reasonable likelihood that the jury convicted the defendant on proof less than proof beyond a reasonable doubt. *Franklin*, 2012 IL App (3d) 100618, ¶ 23 (citing *Victor v. Nebraska*, 511 U.S. 1, 5 (1994)). It held that the trial judge's instruction created such a risk, and therefore the second prong of the plain error rule was satisfied. *Franklin*, 2012 IL App (3d) 100618, ¶ 28.

¶ 29    We do not find *Franklin* and *Turman* determine whether plain error occurred in the present case. While they involved statements quite similar to what the prosecutor said in this case,

those two cases are distinguishable because they involved instructions from the trial judge that attempted to define the reasonable doubt standard. Here, we are only dealing with the statement of a prosecutor. The jury looks to the judge–a neutral arbiter of the trial–to define the law, and would logically place more weight on the judge's discussion of reasonable doubt than that of the prosecutor. Compared to an instruction from a trial judge, the prosecutor's statement here does not carry as grave a danger of distorting the reasonable doubt standard so as to undermine the fairness of defendant's trial.

¶ 30    While the cases dealing with a trial judge's instructions are not determinative, we do take guidance from cases which have addressed a prosecutor's comments on the reasonable doubt standard. We have previously held that a prosecutor's attempt to define reasonable doubt constitutes plain error only when it causes substantial prejudice to the defendant. *People v. Howell*, 358 Ill. App. 3d 512, 524 (2005). Comments on reasonable doubt cause substantial prejudice when they:

> "(1) [S]uggest that the State had no burden of proof or attempt to shift that burden to the defendant; (2) reduce the State's burden of proof to a *pro forma* or minor detail; or (3) amount to involved instructions on reasonable doubt." *Howell*, 358 Ill. App. 3d at 524 (citing *Speight*, 153 Ill. 2d at 374).

See also *People v. Euell*, 2012 IL App (2d) 101130, ¶ 22 (a prosecutor's statement improperly shifting burden of proof to defendant only constitutes plain error when the comments are "so inflammatory or so flagrant that defendant was denied a fair trial"). We cannot conclude that the prosecutor's discussion of reasonable doubt in the instant case meets any of the three elements discussed in *Howell*. The prosecutor did not shift the burden of proof to defendant. The prosecutor did not suggest that its burden of proof was a minor matter. And this statement was but a brief comment in a lengthy closing argument and does not amount to an involved discussion of reasonable doubt.

¶ 31    We reject defendant's argument that we must find plain error here because when a prosecutor improperly discusses the reasonable doubt standard, there is no way to remedy the prejudice to defendant because the court cannot give a clarifying instruction on the reasonable doubt standard. In essence, defendant argues that this is an incurable error. But defendant's argument is controverted by our supreme court's holding in *Speight*. There, during closing argument, the prosecutor improperly told the jury that a reasonable doubt had to be a substantial doubt. *Speight*, 153 Ill. 2d at 374. The defense objected, and the trial court informed the jury " 'I will tell you what the law is in this case. And [the prosecutor's] statement of what the law is is not correct.' " *Speight*, 153 Ill. 2d at 374. The *Speight* court held that because the judge admonished the jury to disregard the prosecutor's statement and then properly instructed the jury on reasonable doubt, there was not substantial prejudice to the defendant. *Speight*, 153 Ill. 2d at 374. Thus, it is clear that a prosecutor's improper comments on the reasonable doubt standard can be remedied by a contemporaneous objection and subsequent instructions from the trial judge.

¶ 32    In the present case, there was no objection to the prosecutor's statement because defendant did not object. But after closing arguments concluded, the trial judge informed the jury: (1) the judge would instruct the jury as to the law; (2) defendant was presumed innocent and that presumption could not be overcome unless the jury was convinced beyond a reasonable doubt that he was guilty; and (3) the State had the burden of proving defendant guilty beyond a reasonable doubt and defendant was not required to prove his innocence. As in *Speight*, the subsequent instructions from the judge here would have reinforced to the jury the importance

of the reasonable doubt standard and the State's burden of proof, and minimized any prejudice to defendant from the prosecutor's improper comment.

¶ 33    In short, defendant has not carried his burden of persuasion that the prosecutor's comment on the reasonable doubt standard was so egregious that it risked the jury using a lesser standard to convict defendant. Therefore, we conclude that this was not an error so serious that it affected the fairness of the defendant's trial or challenged the integrity of the judicial process. Because we do not find plain error, this issue is forfeited.

¶ 34                            II. Ineffective Assistance of Counsel

¶ 35    Next, defendant argues that his trial counsel was ineffective for failing to seek a jury instruction on the issue of causation. Defendant asserts that his trial counsel should have requested that the jury be tendered Illinois Pattern Jury Instructions, Criminal, No. 7.15 (4th ed. Supp. 2011) (hereinafter, IPI Criminal 4th No. 7.15). That instruction provides:

> "In order for you to find that the acts of the defendant caused the death of [the victim], the State must prove beyond a reasonable doubt that defendant's acts were a contributing cause of the death and that the death did not result from a cause unconnected with the defendant. However, it is not necessary that you find the acts of the defendant were the sole and immediate cause of death." IPI Criminal 4th No. 7.15.

According to defendant, a reasonable defense attorney would have requested this instruction. He further argues that had the jury been given this instruction, there is a reasonable probability they would have concluded that the cause of death was Fred's fall at the nursing home and not the earlier injuries he sustained at defendant's home.

¶ 36    To prevail on claim for ineffective assistance of counsel, a defendant must satisfy the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* test). First, a defendant must show that "counsel's performance was deficient in that it fell below an objective standard of reasonableness." *People v. Houston*, 226 Ill. 2d 135, 144 (2007). We analyze this first prong with a strong presumption that defense counsel's conduct might be considered sound trial strategy. *Houston*, 226 Ill. 2d at 144. Second, a defendant must show that "the deficient performance prejudiced the defendant in that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *Houston*, 226 Ill. 2d at 144. This prejudice prong is satisfied if the defendant demonstrates a "probability sufficient to undermine confidence in the outcome." *Houston*, 226 Ill. 2d at 144.

¶ 37    We conclude that defendant cannot satisfy the prejudice prong of *Strickland* because even if IPI Criminal 4th No. 7.15 had been submitted to the jury, there is not a reasonable probability the jury would have acquitted defendant.

¶ 38    We begin our analysis with a background on the law of causation in homicide cases. To be guilty of murder, a defendant's acts are not required to be the sole and immediate cause of death: it is sufficient that the defendant's criminal acts contribute to the victim's death. *People v. Brackett*, 117 Ill. 2d 170, 176 (1987). However, "[t]he courts in Illinois have repeatedly held that an intervening cause completely unrelated to the acts of the defendant does relieve a defendant of criminal liability." *Brackett*, 117 Ill. 2d at 176. Put another way, the State has the burden of proving beyond a reasonable doubt "that the victim's death was not caused by a source unconnected to defendant's act." *People v. Martinez*, 348 Ill. App. 3d 521, 530 (2004). Causation is normally a question for the trier of fact, and when the causal chain is not

- 8 -

immediately apparent, medical experts may be of assistance in determining causation. *Brackett*, 117 Ill. 2d at 177.

¶ 39    Courts in Illinois have often addressed whether an event constitutes an intervening cause in homicide cases. In *Brackett*, the defendant raped and beat the victim, an 85-year-old woman, and she died of asphyxiation five weeks later when she choked on food in a nursing home. Expert testimony established that the injuries inflicted by the defendant put the victim in a weakened condition where she would be unable to dislodge food from her trachea, and she could not be fed through a feeding tube. Noting that causation only requires that the defendant's act contribute to death, the court affirmed the defendant's murder conviction because he "set in motion a chain of events which contributed to [the victim's] death." *Brackett*, 117 Ill. 2d at 179. Similarly, in *People v. Amigon*, the defendant shot the victim, rendering him a quadriplegic; five years later the victim died from pneumonia. *People v. Amigon*, 239 Ill. 2d 71, 82 (2010). Noting that expert testimony established that quadriplegia compromises an individual's immune system, which left the victim unable to fight off the bacterial infection, the court affirmed the defendant's conviction for murder. *Amigon*, 239 Ill. 2d at 82.

¶ 40    Although *Brackett* and *Amigon* involved the defendants' challenges to the sufficiency of the evidence, we note them as illustrations of the principle that to be a true intervening cause, the victim's death must be unrelated to the criminal act of the defendant. See also *People v. Mars*, 2012 IL App (2d) 110695, ¶ 19 ("[A] supervening act will not relieve an accused from responsibility for death of another unless that act is disconnected from the act of the accused." (quoting *People v. Gulliford*, 86 Ill. App. 3d 237, 241 (1980))).[2]

¶ 41    Here, even if the causation instruction were tendered to the jury, it is not reasonably probable the jury could have found Fred's fall in the shower at the nursing home was an intervening cause unconnected to defendant's actions. The jury found that defendant battered Fred at their home on July 18. The attack caused severe injuries, which resulted in Fred being virtually immobilized and bedridden. While being treated at the nursing home, Fred hit his head as the nursing assistant bent over to pick up a washcloth. The State's expert, Dr. Denton, testified that according to the records he reviewed, this fall was not the cause of Fred's death because his level of functioning was unchanged before and after the fall. Although there was some testimony from defendant's family that Fred was recovering, he was still immobile and unable to speak at the time he fell in the shower. It is not reasonably probable that the jury would have concluded that this fall was unconnected to any act of defendant. This is because defendant's attack caused the injuries that placed Fred in that situation in the nursing home: defendant's attack weakened Fred to the point of immobility, and that condition clearly contributed to Fred's fall at the nursing home. Defendant set in motion a chain of events which led to the victim's death. See *Brackett*, 117 Ill. 2d at 178. To be an intervening cause, the event must be unconnected to the criminal act of defendant. The IPI instruction makes this clear. Therefore, defendant was not prejudiced by counsel's failure to request the causation instruction.

---

[2]The court in *Mars* rejected the defendant's argument that gross medical negligence by physicians treating the victim would *always* relieve the defendant of criminal liability for the victim's death. *Mars*, 2012 IL App (2d) 110695, ¶ 19. The court emphasized that to constitute a true intervening cause, the acts of treating physicians would need to be disconnected from the defendant's criminal act. *Mars*, 2012 IL App (2d) 110695, ¶¶ 19, 29-30.

III. Conflict of Interest During Posttrial Motion

¶ 43       After defendant was convicted, he brought a motion for a new trial, alleging in part that error occurred because the trial judge failed to instruct the jury on causation. During arguments on the motion, defense counsel stated that because Fred fell after the alleged assault, there was evidence of an intervening cause and the jury should have been instructed on causation. Defense counsel argued that the definition instruction on proximate cause should have been tendered to the jury.[3] Counsel also stated the following:

> "[T]he defense believes it was error for the jury not to be instructed as to the issue of causation. I will state to the Court that neither the State nor the defense did specifically request an instruction for causation. Nevertheless, we believe that the jury should have been instructed as to that."

¶ 44       On appeal, defendant argues that this exchange demonstrates that defense counsel acknowledged that he should have requested a causation instruction. According to defendant, this acknowledgment means that defense counsel was essentially arguing his own ineffectiveness during the motion for a new trial, creating a *per se* conflict of interest. Defendant asks that we remand because he was entitled to have an attorney without a conflict of interest argue the posttrial motion. The State responds that defense counsel had no conflict of interest. We review *de novo* whether an attorney was laboring under a conflict of interest. *People v. Miller*, 199 Ill. 2d 541, 544 (2002).

¶ 45       The sixth amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel, and this guarantee includes the right to conflict-free representation. *People v. Taylor*, 237 Ill. 2d 356, 374 (2010). There are two types of conflict of interest for defense attorneys: actual and *per se*. When defense counsel has an actual conflict of interest, the defendant must demonstrate that the conflict adversely affected counsel's performance to obtain a reversal and new trial. *People v. Austin M.*, 2012 IL 111194, ¶ 82. With a *per se* conflict of interest, however, the defendant need not establish such an adverse effect, because such a conflict relates to facts about the attorney's status which "engender, by themselves, a disabling conflict." *Austin M.*, 2012 IL 111194, ¶¶ 80-81.

¶ 46       Our supreme court has recognized a *per se* conflict of interest in three situations:

> "(1) [W]here defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) where defense counsel contemporaneously represents a prosecution witness; and (3) where defense counsel was a former prosecutor who had been personally involved in the prosecution of defendant." *Taylor*, 237 Ill. 2d at 374.

None of these situations apply here. In support of his argument that a *per se* conflict arises where an attorney alleges his own ineffectiveness, defendant cites *People v. Lawton*, 212 Ill. 2d 285 (2004). In *Lawton*, the court stated that trial counsel's failure to assert his own ineffective representation in a posttrial motion does not waive the issue on appeal, because an attorney forced to argue his own ineffectiveness would face "an inherent conflict of interest."

---

[3]During the hearing on the posttrial motion, counsel stated that the court should have provided the jury with the proximate cause definition contained in Illinois Pattern Jury Instructions, Criminal, No. 4.24 (4th ed. Supp. 2011) (hereinafter, IPI Criminal 4th No. 4.24). We note, however, that the committee comments provide that "[t]his instruction should not be given when causation is an issue in intentional, knowing or reckless homicide cases. Instruction 7.15 should be given under those circumstances." IPI Criminal 4th No. 4.24, Committee Comments.

*Lawton*, 212 Ill. 2d at 296. See also *People v. Parker*, 288 Ill. App. 3d 417, 421 (1997); *People v. Keener*, 275 Ill. App. 3d 1, 5 (1995). We note, however, that the *Lawton* court did not hold that a *per se* conflict would occur in such a situation: its discussion was limited to waiver. In addition, this court recently did not find a *per se* conflict where a defendant raised a post-guilty-plea allegation of ineffective assistance regarding his attorney and that same attorney argued the motion to withdraw the guilty plea. See *People v. Gabrys*, 2013 IL App (3d) 110912, ¶ 20 (finding no *per se* conflict because the situation did not meet one of the three types of *per se* conflicts identified by our supreme court).

¶ 47     We find no conflict of interest in this case, *per se* or actual, because defense counsel was clearly not arguing that he was ineffective. There is no explicit allegation of ineffective assistance of counsel anywhere in the trial record. During posttrial proceedings, counsel did not argue he provided inadequate representation. All defense counsel did was argue that the failure to instruct the jury on causation was error and explain that he did not request such an instruction. The failure to request the instruction during trial would ordinarily result in forfeiture of the issue, although the trial court still could have granted defendant relief under Illinois Supreme Court Rule 451(c) (eff. July 1, 2006), which is coextensive with plain error doctrine. See *People v. Herron*, 215 Ill. 2d 167, 175 (2005) (a court may review unpreserved errors regarding jury instructions if the interest of justice requires). We will not transform counsel's acknowledgement that the error with the jury instruction was not raised at trial into an allegation of ineffective assistance of counsel.

¶ 48     If we were to adopt defendant's argument here, it would mean that any time defense counsel brings a possibly forfeited error to the court's attention in a posttrial motion, it could be construed on appeal as trial counsel arguing his own ineffectiveness. According to defendant, this would trigger a *per se* conflict of interest. The practical effect of this would be that a new defense attorney would have to be appointed to raise potentially forfeited errors in posttrial motions. Not only would this needlessly strain the resources of the public defender's office, it would effectively deny a criminal defendant the assistance of her trial counsel–presumably the attorney who knows the defendant's case best and is in the best position to argue about the impact of these errors–during posttrial proceedings. While it is true that an attorney cannot be expected to argue his own ineffectiveness (*Lawton*, 212 Ill. 2d at 296), defense counsel here was not doing so. Merely bringing a possibly forfeited error to the trial court's attention, without more, cannot be construed as an allegation of ineffective assistance of counsel. Neither *Lawton* nor the sixth amendment commands such a counterproductive procedure.

¶ 49                                IV. Sentencing

¶ 50     As his fourth argument on appeal, defendant contends that the 30-year sentence imposed for the first degree murder conviction was excessive. He asks that we remand for a new sentencing hearing or use our authority under Illinois Supreme Court Rule 615(b)(4) to reduce his sentence to a 20-year term–the statutory minimum. See 730 ILCS 5/5-4.5-20(a) (West 2010) (setting the sentencing range for first degree murder between 20 and 60 years).

¶ 51     We review a trial court's sentencing decision for an abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). The trial court is granted great deference in imposing a sentence "because the trial court is generally in a better position than the reviewing court to determine the appropriate sentence. The trial judge has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment,

- 11 -

habits, and age." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A court of review may not alter the sentence merely because it would have weighed these factors differently. *Alexander*, 239 Ill. 2d at 212. A sentence within the statutory sentencing range constitutes an abuse of discretion if "the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210.

¶ 52      At the sentencing hearing in this case, defendant presented testimony in mitigation from his wife Terry and son Anthony. They both testified that defendant was a caring and non-violent person. Defendant was active in the community with his band and the Cub Scouts, and he did charity work. Defendant had sustained a brain injury in a fall six years ago, which impaired his short-term memory and other thought processes. Defendant acted as Fred's primary caretaker and Terry and Anthony had never witnessed any violence. Defendant also made a brief statement denying that he beat his father and saying that his father died of pneumonia. The State did not present any evidence in aggravation.

¶ 53      After considering the evidence presented at trial and at the sentencing hearing, the trial court found that three mitigating factors applied: defendant had no prior history of delinquent or criminal activity, the crime was the result of circumstances unlikely to recur, and defendant's character and attitude indicated he was unlikely to commit another crime. In aggravation, the court found that its sentence was necessary to deter others. The court also found in aggravation that the victim was a person who was physically and mentally dependent on defendant. The court then announced a sentence of 30 years in the Department of Corrections for the murder charge.

¶ 54      On appeal, defendant argues that the trial court's sentence was excessive because it ignores his rehabilitative potential. He notes that he was 58 years old at the time of sentencing, and he argues that a 30-year sentence means he will likely die in prison. While it is possible that defendant will die before his release, this fact alone does not make the sentence an abuse of discretion. See *People v. Martin*, 2012 IL App (1st) 093506, ¶ 50. Defendant also argues that the 30-year sentence ignores the fact that the crime was the product of circumstances unlikely to recur and defendant is unlikely to reoffend, as the trial court itself found. Despite the presence of these mitigating factors, the court was not obligated to impose the minimum sentence. *People v. Malin*, 359 Ill. App. 3d 257, 264 (2005). As a court of review, we are not entitled to reweigh defendant's sentence. Given the nature of the crime at issue, and the aggravating factors as found by the trial court, we cannot say that defendant's sentence is disproportionate to the nature of the offense or greatly at variance with the spirit or purpose of the law. We find no abuse of discretion here.

¶ 55                          V. One Act, One Crime

¶ 56      Finally, defendant argues that he was improperly convicted of two crimes stemming from only one physical act. Under the one-act, one-crime doctrine, "[m]ultiple convictions are improper if they are based on precisely the same physical act." *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). Both the charging instruments and the evidence presented during trial only support the theory that defendant attacked his father in a single, generalized instance. Therefore, as the State concedes, the evidence only supports a finding that defendant committed a single physical act. The one-act, one-crime doctrine applies here.

¶ 57      When a defendant is convicted of two offenses based upon the same single physical act, we must vacate the conviction for the less serious offense. *People v. Johnson*, 237 Ill. 2d 81, 97 (2010). Accordingly, we vacate defendant's conviction for aggravated battery of a senior

citizen.

¶ 58                              CONCLUSION

¶ 59        For the foregoing reasons, the judgment of the circuit court of Will County is affirmed in part and vacated in part.

¶ 60        Affirmed in part and vacated in part.