NOTICE
Decision filed 10/03/18. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2018 IL App (5th) 150363

NO. 5-15-0363

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Monroe County. |
| | ) | |
| v. | ) | No. 14-CF-118 |
| | ) | |
| JOSEPH GARCIA, | ) | Honorable |
| | ) | Dennis B. Doyle, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.
Justices Chapman and Cates concurred in the judgment and opinion.

**OPINION**

¶ 1 A jury convicted the defendant, Joseph Garcia, of attempted burglary, and the circuit court sentenced him to 10 years of imprisonment and 2 years of mandatory supervised release. This is the defendant's direct appeal from his conviction and sentence. During his jury trial, the State presented two videotaped confessions that the parties agree contained inadmissible and prejudicial evidence of other crimes involving the defendant. Prior to trial, the circuit court granted the defendant's motion *in limine*, which barred the State from presenting other crimes evidence during the trial. The defendant's counsel, however, did not object to the State admitting unedited copies of the videotaped confessions, thus exposing the jury to the prejudicial other crimes evidence.

¶ 2 The defendant's attorney raised this error in a posttrial motion, characterizing the error as plain error instead of ineffective assistance of counsel. The circuit court denied the posttrial motion.

1

On appeal, the defendant argues that his trial counsel had either a *per se* or an actual conflict of interest during the posttrial hearing because counsel had to argue that his own error resulted in an unfair trial. For the following reasons, we agree with the defendant's argument that defense counsel had an actual conflict of interest when he argued the posttrial motion. Therefore, we vacate the circuit court's denial of the defendant's posttrial motion and remand for the appointment of conflict-free posttrial counsel and for further posttrial proceedings.

¶ 3                                    I. BACKGROUND

¶ 4      The defendant was charged with attempted residential burglary involving a home owned by Mike and Carla Becherer located in Columbia, Illinois. The charges stem from events that occurred in the afternoon on Wednesday, December 17, 2014, at the Becherers' residence. The Becherers' daughter, Veronica, was home alone when someone began knocking on the front door and ringing the doorbell. Veronica did not answer. She watched the person at the front door walk across the street and then back to her house, where he started knocking on the door again. The person then walked to the back of her house and onto the back deck.

¶ 5      Veronica called her mother, Carla, and told her about the person at the house and about a car in the driveway with Missouri license plates. Carla told Veronica to hide, and she called 9-1-1. Veronica hid in a closet and heard loud banging at the back door.

¶ 6      Officers Josh Bayer and Ryan Doetsch with the Columbia Police Department immediately responded to the Becherers' residence. Upon arrival, Bayer saw a gray Mazda passenger car with tinted windows parked in the driveway. Because the windows were tinted, he did not notice that there was a person in the driver's seat of the car. At the back of the house, the officers found the defendant and another individual that they identified as Ryan Ewald, standing on the top of the back deck's stairs. They both wore gloves and cotton stocking caps. The officers arrested them. The

2

person in the gray Mazda drove away, but he was arrested a short time later. The officers learned that the driver was Ryan Ewald's brother, Derek Ewald. As Bayer secured the defendant into the back of a police car, the defendant told him that he was at the house with "Cisco" because of an ad posted on Craigslist. Bayer determined that "Cisco" was Ryan Ewald.

¶ 7    After the arrest, the officers discovered a black knife on the back deck. The tip of the knife was broken off. They also discovered pry marks around the sliding glass door and a broken chuck of landscaping brick that was on a bench on the deck. Carla came home while the officers were still at the house. She told the officers that the broken landscaping brick sitting on a bench did not belong there and that it was not there when she left for work that morning. She also told the officers that the knife found on the back deck did not belong to them and that she had never seen the knife before. She told the officers that scratches by the back door's handle were not there before. She noticed that the back door no longer opened properly. However, there was no evidence that the defendant or Ryan Ewald ever entered the house.

¶ 8    Prior to the defendant's jury trial, the defendant's attorney filed a motion *in limine*, requesting the court to, among other things, bar the State from presenting evidence of other crimes involving the defendant in its case-in-chief. At the hearing on the motion, the prosecutor stated that he did not object to the motion, except in the event that the defendant testified. If he testified, the State "would use his prior criminal convictions to impeach him as a witness." In response, the defendant's counsel emphasized, "I just don't want it brought up in their case in chief." The court granted the motion, barring the State from presenting evidence of other crimes in its case-in-chief. The defendant's motion also requested the court to bar the State from mentioning any burglaries in Columbia, Illinois, in which the defendant had not been charged. At the pretrial hearing, the prosecutor agreed with the motion, stating, "I don't think that would be appropriate, and we don't

3

intend to bring in evidence." The court granted the motion and barred the State from presenting evidence of other burglaries.

¶ 9       At the defendant's trial, the State presented two videotaped interviews of the defendant that were played for the jury in their entirety without any objection from the defendant's attorney. These videotaped interviews showed questions the officers asked of the defendant concerning the events that occurred at the Becherer residence. However, the videotaped interviews also included evidence of other crimes involving the defendant and other burglaries in which the defendant had not been charged.

¶ 10     During the first videotaped interview, the defendant stated that he "did not break into nothing and did not touch nothing." Shortly into the interview, the defendant volunteered to the officers that he was just released "out of the penitentiary about a month ago." One of the officers asked, "for what?" The defendant responded, "for drugs." The officer asked, "what kind of drugs?" The defendant stated methamphetamines. The defendant added that the prison was in Booneville, Missouri, and that he was released on November 4 or 5.

¶ 11     The videotape showed the defendant telling the officers that when he was arrested at the Becherers' residence, he was with a person named "Cisco" and Cisco's brother. He stated that he knew Cisco because he had been "locked up" with him. He also stated that he knew Cisco from getting high and from the "club scene." He stated that the vehicle they used that day belonged to Cisco and his girlfriend. He first told the officers that they were at the Becherer residence because Cisco had told him he was going to buy a laptop off of Craigslist. The defendant stated that he walked around to the back of the house with Cisco to help him knock on the back door. The officers, however, told the defendant that they had already talked with Ryan and Derek Ewald, that they were

4

aware of items in the car that were stolen from houses on previous days, and that this was his only "shot" to tell the truth.

¶ 12   The defendant later admitted that he was not at the Becherer home for a Craigslist purchase but because Cisco was "casing" houses, *i.e.*, looking for houses to break into in order to steal valuables. He insisted, however, that he was not going into the houses, only Cisco. He stated that, at the Becherers' residence, he was at the back of the house only to help Cisco in case someone "ran up on him while he did his thing" and to help him if someone were to "jump on him." He stated that Cisco grabbed the landscaping brick, and when Cisco was going to hit a window with it, he told Cisco, "no, don't do that, man." The defendant told the officers that the knife found on the Becherers' deck was Cisco's knife. He stated that Cisco threw the knife when the officers arrived, adding that he (the defendant) was a "dangerous felon" and "can't have no knives."

¶ 13   During the videotaped interrogation, the officers asked the defendant to tell them what other houses in other subdivisions had been burglarized. They said that they needed to know "where all that stuff came from" in the vehicle. The defendant insisted that he did not know anything about other burglaries in the area or what all was in Cisco's vehicle. He stated that Cisco had gone up to two other houses and knocked on the doors but he stayed in the vehicle. The defendant admitted that if someone answered the door, Cisco would pretend to ask for directions and that if no one answered he would "go in there." He insisted that he did not get out of the car at the other houses and that he went to the back of the Becherers' house only because Cisco was afraid that there was a dog. He stated that he did not do anything because he was "on probation."

¶ 14   The videotape showed the defendant telling the officers that he knew Cisco "through drugs" and that the two "go to the same dope dealer." The officers told the defendant that he was admitting to participating in the burglary of the Becherers' residence because he was found at the scene. The

5

officers also accused him of "everything else" and "other burglaries," telling the defendant that he had "been to prison before" and that he was "with these guys." The defendant insisted that he had nothing to do with any of the Ewalds' other activities, adding that the officers did not believe him because he was "a criminal."

¶ 15    The videotape showed the officers continuing to question the defendant about other burglaries that they suspected the Ewalds had committed, and the defendant told the officers to look at his cell phone to see what he was doing, adding that there might be some "drug activity" on his phone. The officers told the defendant that they were interested in where he was on certain dates of other burglaries. The defendant responded that he did not know anything about them and had just got out of prison a month ago. The officers stated that the burglaries started "a couple weeks ago." At one point, the defendant was having trouble remembering where he had been at various times and told the officers that he did not want his children's mother to know that he had been with another woman and was getting high.

¶ 16    The defendant told the officers that he was not a burglar, that the drug case that he had the year before was the "only non-violent crime" he had on his record, and that the reason he "had violent crimes in the past" was because he "gangbanged." One of the interrogating officers told the defendant, "If you weren't with [Cisco] these other days, then you've gotta have proof as far as where you were at. Otherwise, in our eyes, you were with him." The officers continued to state that they believed the defendant was involved with "all the other burglaries" and guessed that Cisco was probably going to give him "some dope" or heroin in exchange for his involvement. The defendant admitted that he used heroin over the weekend and that Cisco mentioned doing another burglary when they spoke at a dope house the day before the Becherer burglary attempt. He told the officers that he saw Cisco frequently at the dope house and that he had used meth the night before his arrest.

6

¶ 17    At various points during the videotaped interview, the defendant revealed that he served a 12-year sentence, from 1998 to 2010, for shooting someone; that when he got out of prison, he did well until he started getting high and selling drugs; and that he then did another 1-year prison sentence. In addition, he revealed that he was not supposed to be in Columbia, Illinois, because he was on probation, that he thought doing time in Missouri was easy compared to Illinois, and that he did not know how to use a computer because he had "been locked up for so long." He admitted to the officers that he had a drug problem, that it might not be easy for him to find a job because he had been in prison, that he was going to visit his "P.O." (probation officer) on the day of his arrest, that the Ewalds' car contained stolen property from other burglaries in Columbia, Illinois, and that he had been in jail for most of his daughter's life.

¶ 18    After the first interview with the defendant, the officers interviewed Ryan and Derek Ewald and then conducted a second videotaped interview of the defendant. Again, the State played the second videotaped interview to the jury in its entirety without any objection from the defendant's attorney. The second videotaped interview included additional questions asked by the officers pertaining to the Becherer burglary attempt. In the videotaped interview, the officers convinced the defendant to ride around and show them where he and the Ewalds had been that afternoon. The officers told the defendant that he had spent the majority of his life in prison and that he should help himself by helping the officers. Similar to the first videotaped interview, the second interview included references to the defendant frequenting a "dope house," his use of drugs, and references to his "P.O." He also pulled up his jacket sleeve to show the officers "track marks" from recent drug use and referenced warrants for his arrest, telling the officers that he had two outstanding warrants in St. Clair County.

¶ 19 The defendant's attorney did not offer any objections to the contents of either of the videotaped interviews. After the State concluded its case-in-chief, the defense rested without presenting any evidence. The jury subsequently found the defendant guilty of attempted residential burglary of the Becherers' residence.

¶ 20 On July 23, 2015, defense counsel filed a motion for a new trial. In the motion, defense counsel wrote that "certain evidence[ ] was introduced that was prejudicial to Defendant such that Defendant is entitled to a new trial." Counsel wrote that "the introduction of the video of Defendant's interrogation by police was prejudicial in that it contained numerous references to his prior criminal history." Citing the standard for the plain error rule, the defendant's attorney wrote that "the evidence was so closely balanced that the error alone threatened to tip the scales of justice against defendant; or the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence."

¶ 21 At the hearing on the posttrial motion, defense counsel and the trial court had conflicting recollections concerning the events leading up to admission of the videotaped interviews. Defense counsel explained that he did not object to the interrogation videos because he "was certain that it was probably redacted." The court, however, stated that its recollection was that defense counsel "understood exactly what the content of the video was and did not object to it being admitted and agreed that it was not in violation of the Motion *in Limine*." The court told defense counsel that if there was "any inkling whatsoever that [defense counsel] didn't understand the content of the video, [it] would never have allowed it to be played." The court asked counsel whether he was going to "put on some evidence of that?" The defendant's attorney responded that the video was "so harmful

8

and prejudicial" and that he "should have objected" but did not, explaining, "I wasn't sure what the contents of—I had some idea. I reviewed the video." The following exchange took place:

"THE COURT: That's not my recollection of the facts. I thought it was represented to me that you had reviewed the video, that you knew the contents, and that you had no objection to it being played as part of your trial strategy, understanding that there may be prejudicial effects to your client, that they would be overweighed—be outweighed by the—your theory of the defense of the case.

[DEFENSE COUNSEL]: Well, that,—I mean, that's not my recollection. I mean, my understanding was that they were gonna play certain parts. I didn't know they were gonna play the whole thing straight through.

* * *

THE COURT: My recollection was that you said that if they hadn't—if they didn't play the whole thing, that you would have the right to play any portions that were not played, and that it was agreed that the entire thing be played."

¶ 22 The court stated: "So if you have some factual issues that you want me to take into consideration on your motion, you'll have to present evidence on that. I'm not going to accept your unsworn argument as to the facts that are not before the Court." The court then asked the defense attorney how he wanted to proceed. Defense counsel responded that regardless of the reason for the videos' admission into evidence, "it's still plain error given that—the nature of the prejudicial—I mean, it talks about previous crimes and previous convictions." The court added, "At length and other crimes being committed and all kinds of things like that" and "things that are obviously prejudicial to your client." The court stated that the prejudicial things "were not objected to" and that it was represented to the court "that that was part of the theory of the Defense's case."

9

¶ 23    The prosecutor stated that defense counsel had the video for 200 days prior to trial and that "[a]ny argument made now is basically an appellate argument, and I think the argument being made is incompetence of counsel."

¶ 24    The defendant's attorney declined to put on any evidence of the circumstances leading up to the admission of the videotaped interviews, emphasizing that he was not "casting blame on anyone." The circuit court denied the posttrial motion and sentenced the defendant to a term of 10 years in the Department of Corrections. The defendant now appeals his conviction and sentence.

¶ 25                                    II. ANALYSIS

¶ 26    The only issue the defendant has raised on appeal concerns an alleged conflict of interest of his attorney at the posttrial stage of the proceedings below. The defendant notes that the substance of the posttrial motion filed by his attorney was that his attorney should have objected to the admission of portions of the videotaped interviews and that his failure to do so resulted in the admission of inadmissible evidence that was harmful and prejudicial. On appeal, the defendant argues that, under these circumstances, at the hearing on the posttrial motion, defense counsel had a *per se* conflict of interest because he had to argue his own ineffectiveness. Alternatively, the defendant argues that his counsel had an actual conflict of interest. On appeal, we review *de novo* whether an attorney was laboring under a conflict of interest. *People v. Miller*, 199 Ill. 2d 541, 544 (2002).

¶ 27                                A. *Per Se* Conflict

¶ 28    A criminal defendant's constitutional right to effective assistance of counsel encompasses the right to conflict-free counsel. *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008). An attorney's conflict of interest may be either *per se* or actual. See *id.* In the context of criminal proceedings, the supreme court has identified three situations causing a *per se* conflict: (i) defense counsel has a prior or contemporaneous relationship with the victim, prosecution, or entity assisting the prosecution;

10

(ii) defense counsel contemporaneously represents a prosecution witness; and (iii) defense counsel was a former prosecutor who had been personally involved in the defendant's prosecution. *People v. Taylor*, 237 Ill. 2d 356, 374 (2010).

¶ 29    In the present case, the defendant argues that his attorney was conflicted at the posttrial stage of the proceedings below because the attorney admitted that his failure to object to the admission of the videotaped interviews resulted in the admission of inadmissible and prejudicial evidence. The defendant argues that because his attorney had to argue his own ineffectiveness in order for the posttrial motion to prevail, his attorney labored under a *per se* conflict while arguing the posttrial motion. The defendant agrees that this alleged conflict does not fall within any of the three categories of *per se* conflict defined by the supreme court noted above. Nonetheless, the defendant asks us to define a fourth category of *per se* conflict, *i.e.*, when defense counsel has to assert his own ineffectiveness on behalf of a criminal defendant.

¶ 30    In *People v. Brown*, 2017 IL App (3d) 140921, ¶ 31, the court noted that the appellate courts are split concerning whether or not posttrial counsel has a *per se* conflict when he has to argue his own ineffectiveness at trial. We are persuaded by the majority of cases that have declined to expand upon the supreme court's definition of a *per se* conflict to include situations in which defense has to argue his or her own ineffectiveness in posttrial proceedings. We do not believe there is a basis for finding a *per se* conflict under such circumstances, particularly when the defendant does not request a new attorney. See *People v. Davis*, 151 Ill. App. 3d 435, 442-43 (1986); *People v. Perkins*, 408 Ill. App. 3d 752, 762 (2011) ("[a] *per se* conflict of interest does not exist merely because a defense attorney's competence is questioned by his client during posttrial proceedings; rather, the underlying allegations of incompetence determine whether an actual conflict of interest exists" (internal quotation marks omitted)).

11

¶ 31    In support of his argument that a *per se* conflict existed, the defendant cites *People v. Lawton*, 212 Ill. 2d 285, 296 (2004), where the supreme court found defense counsel's failure to assert his own ineffectiveness in a posttrial motion did not forfeit the issue on appeal, noting that an attorney forced to argue his own ineffectiveness would face "an inherent conflict of interest." We disagree with the defendant's argument. We do not believe that the supreme court established a new category of *per se* conflicts by making this statement in *Lawton*. Instead, the court's comment related to whether an issue was forfeited on appeal because of the attorney's failure to raise the issue in a posttrial motion. See *People v. Sullivan*, 2014 IL App (3d) 120312, ¶ 46 ("[T]he *Lawton* court did not hold that a *per se* conflict would occur in such a situation: its discussion was limited to [forfeiture].").

¶ 32    Because the facts of the present case do not present us with a *per se* conflict, we will limit our analysis to deciding whether the defendant's counsel had an actual conflict during the posttrial stage of the proceedings.

¶ 33                                    B. Actual Conflict

¶ 34    The supreme court has stated that when a defendant cannot establish a *per se* conflict of interest, he may "still establish a violation of his right to effective assistance of counsel by showing an actual conflict of interest that adversely affected his counsel's performance." *Hernandez*, 231 Ill. 2d at 144. To show an actual conflict of interest, a defendant must point to " 'some specific defect in his counsel's strategy, tactics, or decision making attributable to [a] conflict.' " *People v. Morales*, 209 Ill. 2d 340, 348-49 (2004) (quoting *People v. Spreitzer*, 123 Ill. 2d 1, 18 (1988)). In other words, a defendant "need not prove prejudice in that the conflict contributed to the conviction, but it is necessary to establish that an actual conflict of interest adversely affected the lawyer's performance." *People v. Austin M.*, 2012 IL 111194, ¶ 82.

12

¶ 35    A recent example of an actual conflict at the posttrial stage of a criminal proceeding is found in *Brown*, 2017 IL App (3d) 140921. In that case, a jury convicted the defendant of domestic battery. *Id.* ¶ 1. At the posttrial stage, the defendant filed a *pro se* letter in which he stated that he wanted to appeal the jury's verdict because, among other things, one of his witnesses was not called to testify. *Id.* ¶ 12. Prior to sentencing, the defendant's attorney made an oral motion to set aside the jury's verdict and adopted that part of the defendant's letter with respect to failure to call a witness as part of the basis for the motion. *Id.* ¶ 13.

¶ 36    The court asked defense counsel whether she had any witnesses she wanted to present with respect to the motion, and counsel told the court that she would proceed through proffer instead. *Id.* ¶ 14. Counsel then told the court that defendant had told her about two occurrence witnesses, that she had thought that the two individuals were actually only one person, and that she could not locate that person because the defendant did not have an address. *Id.* Defense counsel then explained that, at the trial, she learned that the defendant had actually described two occurrence witnesses, not one, but by then the trial had already begun and it was too late to add this additional witness. Defense counsel told the court that the defendant believed that if either witness had been called, they would have been able to testify with respect to his innocence. Defense counsel concluded, " 'So we'd ask the Court to reconsider the verdict or to set aside the verdict of the jurors on the basis that this was nothing short of just a miscommunication and that it's a miscommunication between him and me that led to him not being able to call all the people that could be put on, the best case to determine whether he in fact was guilty or innocent.' " *Id.*

¶ 37    The circuit court denied the motion, stating that a miscommunication between the attorney and the defendant was not a proper basis for setting aside the jury's verdict. *Id.* ¶ 15. The court also

13

concluded that, based on the defense counsel's summary of events, the defendant failed to provide his counsel with enough information to contact the witnesses. *Id.*

¶ 38    On appeal, the defendant argued, among other issues, that his attorney proceeded under an actual conflict of interest at the posttrial stage of the proceedings when she had to argue her own ineffectiveness. *Id.* ¶ 28. The *Brown* court agreed, concluding that the defendant's counsel had an actual conflict of interest because the motion to set aside the verdict "was premised on a single issue: her own ineffectiveness in calling defendant's witnesses." *Id.* ¶ 32. The court noted that, in order to prevail, the defendant's attorney was obligated to show that her performance was constitutionally deficient and that, but for her deficient performance, a reasonable likelihood existed that the result of the trial could have been different. *Id.* The attorney, however, failed to make any effort to show either of these prongs of ineffective assistance of counsel and instead placed the blame on the defendant and a miscommunication, a characterization that led to the denial of the motion. *Id.* ¶ 33. The court also noted that the defense counsel did not present any evidence concerning the missing witnesses' potential testimony. *Id.* The court concluded that counsel's errors at the posttrial stage "were attributable to the conflict of interest inherent in arguing her own ineffectiveness." *Id.* The court vacated the circuit court's denial of the defendant's posttrial motion and remanded the matter for the appointment of conflict-free counsel, who was authorized to include "whatever issues he or she deems meritorious in a new posttrial motion." *Id.* ¶ 34.

¶ 39    We find *Brown* to be persuasive. Here, like the facts in *Brown*, the defendant's posttrial motion was based on a single issue: counsel's failure to object to the inadmissible and prejudicial portions of the interrogation videotapes, which included evidence of other crimes, bad acts, and uncharged burglaries. In order for the posttrial motion to prevail, defense counsel was obligated to show that his performance was deficient and that the deficient performance so prejudiced the

14

defendant that he was denied a fair trial. See *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (two-part test adopted by the supreme court in *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984)). The defendant's attorney, however, did not make any effort to show either prong of the *Strickland* standard, and the record establishes that his failure to do so was attributable to the conflict of interest inherent in having to argue his own ineffectiveness.

¶ 40    Defense counsel told the court that he had assumed that the videos the State would show to the jury were "probably redacted." The court disagreed with defense counsel's recollection of the events at the trial, and the court's comments reveal a factual issue concerning the circumstances leading up to the admission of the videotaped interviews and whether defense counsel's failure to object was a matter of trial strategy or ineffectiveness. See *People v. Easley*, 192 Ill. 2d 307, 317 (2000) ("[T]he defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy.").

¶ 41    The circuit court stated that it believed that defense counsel "understood exactly what the content of the video was" and that counsel's failure to object to the admission of the video was part of his trial strategy, even though the video contained things that were "obviously prejudicial" to the defendant. The circuit court asked defense counsel if he was going to put on any evidence, and counsel declined to do so. However, in questioning defense counsel about the basis for the posttrial motion, the circuit court emphasized that much of the pretrial discussion about the admission of the videotapes occurred off the record. The court advised defense counsel, "So if you have some factual issues that you want me to take into consideration on your motion, you'll have to present evidence on that." Instead of presenting evidence, counsel argued that the video was prejudicial regardless of how it came in because its admission was "plain error." In arguing plain error, counsel emphasized that he was not "casting blame on anyone." The court, however, rejected this argument and told

15

counsel it was not going to accept his "unsworn argument" concerning the admission of the videotape. Nonetheless, counsel declined the circuit court's invitation to present evidence on the issue. The circuit court, therefore, denied the posttrial motion.

¶ 42    Like the defense counsel in *Brown*, we believe that defense counsel's failure to present evidence was attributable to his reluctance to prove his own ineffectiveness. Therefore, based on the record before us, we cannot say that the defendant's counsel vigorously and zealously asserted grounds for a new trial based on counsel's admitted mistake, and we believe counsel's failure to effectively present the issue was caused by an actual conflict of interest.

¶ 43    On appeal, the State emphasizes that the defendant's posttrial motion did not specifically advance an argument couched in terms of ineffective assistance of counsel but was based on "plain error." The State, therefore, argues that defense counsel did not have an actual conflict of interest in arguing plain error. In support of its argument, the State cites *Sullivan*, 2014 IL App (3d) 120312. *Sullivan* is distinguishable from this case.

¶ 44    In *Sullivan*, the court held that defense counsel did not have a *per se* or actual conflict at a posttrial hearing. *Id.* ¶ 48. In the posttrial motion, the attorney raised an issue with respect to the court's failure to instruct the jury on causation, and counsel admitted that he did not request the instruction. *Id.* ¶ 47. The *Sullivan* court held that the attorney did not have a conflict in arguing the posttrial motion, noting that counsel's failure to request an instruction would normally result in forfeiture of the issue, but the court could still grant relief under Illinois Supreme Court Rule 451(c) (eff. July 1, 2006). *Sullivan*, 2014 IL App (3d) 120312, ¶ 47. The court concluded, "We will not transform counsel's acknowledgement that the error with the jury instruction was not raised at trial into an allegation of ineffective assistance of counsel." *Id.*

16

¶ 45    In assessing *Sullivan*'s relevance to the facts of the present case, it is important to keep in mind that "the underlying allegations of incompetence determine whether an actual conflict of interest exists." (Internal quotation marks omitted.) *Perkins*, 408 Ill. App. 3d at 762. The underlying allegation in the present case does not involve a defense attorney "[m]erely bringing a possibly forfeited error to the trial court's attention" as was the case in *Sullivan*. *Sullivan*, 2014 IL App (3d) 120312, ¶ 48. Here, the substance of the underlying allegation is counsel's failure to object to inadmissible and prejudicial other crimes evidence contained in the videotapes. Case law establishes that this type of error is not merely an issue of forfeiture but can be the foundation for a claim of ineffective assistance of counsel. See *People v. Moore*, 2012 IL App (1st) 100857, ¶¶ 53-57 (counsel who failed to object to other crimes evidence on interrogation videos shown to the jury was found ineffective); *People v. Phillips*, 227 Ill. App. 3d 581, 590 (1992) (testimony elicited by defense counsel of a police officer offering hearsay statements that the defendant participated in other crimes was determined to be "devastating" to defendant's case and constituted ineffective assistance of counsel, and a new trial was ordered); *People v. Fletcher*, 335 Ill. App. 3d 447, 453-54 (2002) (Defense counsel who had defendant summarize his criminal history was deemed ineffective, and appellate court affirmed, stating: "No reasonable defense lawyer would ask his client to tell the jury about an extensive history of criminality *** in order to convince the jury that he is innocent of a like crime because he denies his guilt instead of pleading guilty.").

¶ 46    The underlying allegation in the present case is more akin to that in *Brown* rather than *Sullivan*. See *Brown*, 2017 IL App (3d) 140921, ¶ 32 ("Defense counsel's performance may be deficient where she fails to call known witnesses whose testimony may exonerate the defendant."). Also, even though defense counsel characterized his error as plain error, in the context of the facts of this case, the distinction between plain error and ineffective assistance of counsel is immaterial. See

17

*People v. Jackson*, 2018 IL App (1st) 150487, ¶ 36 ("Although defendant has raised this issue under the rubric of ineffective assistance of counsel rather than plain error, the distinction is immaterial."). Finally, *Sullivan* is further distinguishable from the present case in that *Sullivan* did not involve evidence that defense counsel's performance in arguing the posttrial motion was adversely affected by counsel having to admit his error. Our decision here, as in *Brown*, is based on evidence that an actual conflict adversely affected counsel's performance in presenting grounds for a new trial at the posttrial hearing.

¶ 47    A criminal defendant has a constitutional right to the undivided loyalty of counsel, free of conflicting interests. *People v. Woidtke*, 313 Ill. App. 3d 399, 409 (2000). When a criminal defendant's attorney is aware that he has committed an error or made an omission during trial and that the error or omission arguably resulted in the defendant receiving an unfair trial, the attorney has an obligation to bring the error or omission to the trial court's attention and zealously argue that the mistake warrants a new trial. Under such circumstances, the defendant's attorney does not have a *per se* conflict of interest. If counsel zealously and effectively argues for a new trial based on his error or omission, the defendant has not been denied his constitutional right to conflict-free counsel. See, *e.g.*, *Perkins*, 408 Ill. App. 3d at 762 (finding no conflict of interest where defense counsel zealously asserted a claim of ineffective assistance on the defendant's behalf).

¶ 48    However, in these situations, when counsel fails to adequately assert an ineffective assistance of counsel claim on the defendant's behalf and the record indicates that counsel's failure to do so was influenced by counsel's reluctance to argue his own ineffectiveness, the defendant has been denied his constitutional right to conflict-free counsel. Under such circumstances, counsel's loyalty is divided between the defendant's interests and counsel's own self-interests. When this division in loyalty adversely affects the lawyer's performance during posttrial proceeding, we are

18

constitutionally obligated to vacate the lower court's order denying posttrial relief and remand for the appointment of conflict-free posttrial counsel and for a new posttrial hearing.

¶ 49 Here, the defendant's attorney had to argue that his own mistake resulted in an unfair trial. This is true regardless of whether he couched the issue in terms of plain error or ineffective assistance of counsel. The record establishes that defense counsel was reluctant to "cast[ ] blame on anyone" and declined the circuit court's request that he present evidence on the issue, which resulted in the circuit court summarily denying the posttrial motion. Under these facts, the defendant was denied his constitutional right to conflict-free counsel at the posttrial stage of the proceedings. Therefore, we are obligated to vacate the circuit court's denial of the defendant's posttrial motion and remand this case for the appointment of conflict-free counsel, who may file a new posttrial motion and may raise whatever issues he or she deems meritorious in a new posttrial motion and hearing. See *Brown*, 2017 IL App (3d) 140921, ¶ 34. In doing so, we emphasize that we express no opinion on whether defense counsel's failure to object to the admission of the videotaped interviews satisfies either prong of the *Strickland* standard.

¶ 50                                        III. CONCLUSION

¶ 51 For the foregoing reasons, we affirm the circuit court's judgment in part, vacate in part, and remand with directions.

¶ 52 Affirmed in part and vacated in part; cause remanded with directions.

19

2018 IL App (5th) 150363

NO. 5-15-0363

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Monroe County. |
| | ) | |
| v. | ) | No. 14-CF-118 |
| | ) | |
| JOSEPH GARCIA, | ) | Honorable |
| | ) | Dennis B. Doyle, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

**Opinion Filed:** **October 3, 2018**

_____

**Justices:**       Honorable David K. Overstreet, J.

Honorable Melissa A. Chapman, J., and
Honorable, Judy L. Cates, J.,
Concur

_____

**Attorneys**      James E. Chadd, State Appellate Defender, Ellen J. Curry, Deputy
**for**            Defender, Jennifer M. Lassy, Assistant Appellate Defender, Office
**Appellant**      of the State Appellate Defender, Fifth Judicial District, 909 Water
Tower Circle, Mt. Vernon, IL 62864

_____

**Attorneys**      Christopher Hitzemann, Monroe County State's Attorney, Monroe
**for**            County Courthouse, Waterloo, IL 62298; Patrick Delfino, Director,
**Appellee**       David J. Robinson, Deputy Director, Erin Wilson Laegeler, Staff
Attorney, State's Attorneys Appellate Prosecutor, 725 South Second
Street, Springfield, IL 62704

_____