NOTICE

Decision filed 09/12/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240649-U

NO. 5-24-0649

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 23-CF-248 |
| | ) | |
| JAMIR JORDAN, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice McHaney and Justice Moore concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court's denial of defendant's amended motion to withdraw guilty plea and vacate judgment is vacated and the case is remanded where defense counsel harbored an actual conflict of interest, thus depriving defendant of effective counsel at his postplea hearing.

¶ 2                              1. BACKGROUND

¶ 3     On May 8, 2023, defendant, Jamir Jordan, was charged, by information, with two counts of armed robbery in violation of section 18-2(a)(2) of the Criminal Code of 2012 (Code) (720 ILCS 5/18-2(a)(2) (West 2022)), one count of aggravated vehicular hijacking in violation of section 18-4(a)(4) of the Code (*id.* § 18-4(a)(4)), and unlawful use of weapons by a felon in violation of section 24-1.1(a) of the Code (*id.* § 24-1.1(a)). The armed robbery charges alleged that on May 5, 2023, defendant, while armed with a firearm, robbed Jose Rojas and Uriel Tejeda

1

Barajas of their cell phones, money, credit cards, and jewelry. The aggravated vehicular hijacking charge alleged that defendant, while armed with a firearm, took Jose Rojas's motor vehicle. These three charges also noted that a 15-year mandatory firearm enhancement would be added to any term of imprisonment pursuant to section 18-4(b) of the Code (*id.* § 18-4(b)).

¶ 4    On August 21, 2023, defendant, through his appointed counsel Celeste Korando, filed a motion for severance, requesting that the charge of unlawful use of a weapon by a felon be severed from the other counts. During a status hearing on the same day, subsequent to scheduling the motion for severance for a later hearing, the trial court clarified to defendant the purpose of filing the motion and inquired if he had any questions. Defendant asked why his offer indicated that a sentence would need to be served at 85% instead of 50%. He further stated that he had asked Korando about filing motions, and that she had responded that she was "going to look it up," which he interpreted as implying she was not going to file any. The trial court explained to defendant that such decisions were matters of trial strategy and Korando's experience as to whether any other motions should be filed.

¶ 5    Upon inquiry by the trial court, Korando stated that she had discussed with defendant that any sentence would be served at 50%, and that the State's offer was in error regarding the 85%. The state's attorney concurred with Korando and affirmed that the offer should have indicated that any sentence would be served at 50%. Subsequently, the trial court explained to defendant the potential penalties for each count, including the additional time for enhancements.

¶ 6    A hearing concerning all pending matters was held on August 23, 2023. The State indicated that it had no objection to the motion to sever and that it would proceed to trial on August 28, 2023, on the first three counts. The trial court reviewed the information to be communicated to the jury regarding defendant's charges, and neither party voiced an objection. Subsequently, the court

reiterated the potential penalties for the three counts, noted that the sentence would be served at 50%, and explained the enhancements to each count.

¶ 7    On August 28, 2023, the parties notified the trial court that they had reached a fully negotiated plea agreement. When defendant was asked to confirm this, he stated that it was correct. The negotiated plea agreement involved defendant pleading guilty to count I (armed robbery) without any enhancement sentencing, in exchange for an 18-year sentence to be served at 50% in the Illinois Department of Corrections. The remaining counts, including the severed count IV, were to be dismissed with an understanding that if the plea was ever withdrawn, all charges would be reinstated.

¶ 8    After being informed of the agreement, the trial court explained to defendant the potential penalties associated with pleading guilty to the Class X charge, including the duration of mandatory supervised release. Defendant expressed understanding of the charge and its associated penalties and stated that he had no questions. The court further apprised the defendant of the rights he would be giving up if he proceeded with the plea, to which the defendant acknowledged that he understood. Defendant understood that he would be accepting responsibility for the actions contained in the armed robbery charge, and he stated that he was "just willing to accept my responsibility so I can get back into the world and take care of my kids." The court admonished defendant regarding the consequences of being a convicted felon, such as the prohibition on possessing firearms. Defendant affirmed his understanding of the plea agreement terms and indicated he had no questions. When questioned by the court, defendant denied that anyone forced or threatened him into signing the guilty plea. Subsequently, the State recited the factual basis for the plea. The court inquired, "One final time, is this your decision today, Mr. Jordan, to plead guilty, take responsibility for that charge?" Defendant responded, "[Y]es, sir." Korando made an

oral motion for furlough. After discussion with defendant concerning his family and his plans, and considering arguments from counsel, the motion was denied. An executed plea agreement was filed on August 28, 2023, in accordance with the terms discussed at the hearing. The document also confirmed that "[o]ther than the plea agreement, no other promises have been made to me to cause me to enter this plea." Additionally, defendant's counsel certified that she "fully explained and answered any questions" to defendant regarding his guilty plea, "including its terms and ramifications."

¶ 9     On August 30, 2023, Korando filed a motion to withdraw defendant's guilty plea and vacate the judgment. In the motion, Korando claimed that defendant's guilty plea should be withdrawn because, "The Defendant indicated to counsel after the guilty plea and sentence were entered that 'I felt pressured to plead guilty by the State's Attorney and my attorney.' "

¶ 10    On March 4, 2024, a hearing was conducted regarding defendant's motion. The trial court questioned defendant about the allegation that he felt pressured, which defendant confirmed was correctly stated in the motion. The court proceeded with its preliminary *Krankel* (*People v. Krankel*, 102 Ill. 2d 181 (1984)) inquiry. The court asked defendant to elaborate on how he felt threatened by Korando. Defendant responded that he was "[b]asically coerced to really take the plea." He explained that he informed Korando multiple times that he had no involvement in the acts that occurred, and that she had responded that the best she could do was the plea and that she was not going to fight the charges the way defendant wanted. Defendant noted that Korando did not file any of his requested motions. Defendant indicated that Korando presented him with an offer on Friday, and then "she actually gave the deal that Monday before we went to trial, which I signed right then and there." He further complained that the original offer involved a sentence of 31 years' incarceration to be served at 85%. He claimed that Korando told him the judge was likely

4

to impose a sentence of 45 to 65 years if he was convicted. She also advised him to refrain from saying anything "stupid" at the plea hearing, as the judge did not have to accept the plea agreement. Defendant stated that he was not caught with the gun or "other stuff," and that another individual, who was caught with "the stuff," "got a lesser charge than me, and I ain't even the one who—he the one who did all the crime *** I was, you know, forced in it." He complained that he was charged with the codefendant's gun and claimed he should not have received a harsher sentence than the codefendant due to his skin color. He accused Korando of speaking more with the state's attorney than with him and felt that she was biased and ineffective. Defendant mentioned a letter he wished to present at the plea hearing, but Korando had advised against it, telling him the judge does not have to accept the plea. When asked in what way Korando was ineffective, he responded that she would become angry during visits and did not have her paperwork with her. He added that she repeatedly emphasized the possible sentences with added enhancements and said, "That will scare anybody." Defendant complained that he would not see his family again and stated that he was trying to do what was best for himself.

¶ 11    In response, Korando stated that she received discovery and an offer from the State and reviewed it with defendant. She stated that the original offer entailed a sentence of 31 years' incarceration to be served at 85%, though the 85% figure was corrected in court to 50%. She further explained that the initial offer fell within the range that included the sentence enhancement; however, through negotiations, she was able to reduce the offer to 18 years. She indicated that the trial court properly administered the necessary admonishments during the plea hearing, and that defendant attested to not being coerced or threatened into accepting the plea. Regarding the filing of motions, she indicated that such actions pertained to trial strategy and that she had filed at least one motion concerning the severance of charges. Concerning other possible motions, she would

have reviewed the materials sent by defendant and, considering trial strategy, determined whether to file them. She emphasized that her role involved negotiating with the State and discussing trial-related issues. She also stated that she would not file frivolous motions or pleadings that were not in the best interests of her client. She indicated that the factual basis presented to the court during the plea hearing on August 28, 2023, established there was an "overwhelming evidence of guilt" and that the negotiated plea was under the minimum sentence if defendant was convicted on "any of the charges that he had been charged with in the bill of indictment."

¶ 12 After hearing from both parties, the trial court determined that Korando's actions constituted "trial strategy or otherwise lack merit" and subsequently declined to appoint new counsel. Korando requested additional time to review defendant's motion to vacate and withdraw his guilty plea, and to file an amended motion if deemed necessary.

¶ 13 On May 1, 2024, Korando filed an amended motion to withdraw guilty plea and vacate judgment. The motion reaffirmed that defendant felt pressured by Korando and the state's attorney to enter a guilty plea. Additionally, it asserted that defendant's guilty plea should be withdrawn because he felt forced or threatened into pleading guilty, believed he received ineffective assistance of counsel throughout the case, and contended that he was not guilty of the offense for which he pled guilty. Furthermore, Korando filed a Rule 604(d) (Ill. S. Ct. R. 604(d) (eff. Apr. 15, 2024)) certificate.

¶ 14 A hearing on the amended motion occurred on May 1, 2024. Korando indicated that defendant wished to testify regarding his allegations of ineffective assistance of counsel, believed it was inappropriate for her to question him about these allegations, and sought leave of court to file a motion to withdraw as counsel. In response, the trial court conducted a second preliminary *Krankel* inquiry. Defendant complained that the "grand jury indictment" was not properly reduced

6

to a lesser charge. He also asserted that the original plea offer presented to him specified that his sentence would be served at 85%, rather than the correct 50%. Defendant argued that he intended to appeal following the court's last hearing; however, Korando stated that they were unable to do so at that time and declined to assist him. He further alleged that Korando did not adequately explain the plea deal to him. He claimed that after the previous court date, Korando stated she would visit or call him, but neither occurred, and he felt pressured to accept the offer. He stated, "I know all y'all been working with each other and y'all been friends and then for me to come in here this morning, she [was] laughing and joking with the state's attorney." Defendant asserted that Korando did not provide any assistance or file motions on his behalf, and he received no support because of his race. He argued that no one involved in his case was harmed, that he was uninvolved in the incident, and that he was a victim. He also claimed that his offer was increased from 10 years to 18 years of incarceration.

¶ 15    In response, Korando acknowledged that the original offer from the state's attorney indicated that defendant was required to serve his sentence at 85%, as opposed to 50%. However, she noted that this issue had since been resolved. She disclosed that defendant's original plea offer was for 31 years' incarceration, but she successfully negotiated it down to 18 years. She affirmed that there was never an offer of a 10-year sentence. Korando stated that she had multiple visits with defendant during his incarceration, including the week prior to the trial. She asserted that defendant was not presented with the offer at the last minute; rather, she had reviewed it with him in jail, providing him ample opportunity to contemplate the offer. She further disputed the assertion that she and the state's attorney were friends. She informed the trial court that the evidence of defendant's guilt was overwhelming and reiterated her motion to withdraw as counsel, requesting the appointment of new counsel.

¶ 16    After hearing from defendant and Korando, the trial court pointed out that defendant reiterated the same assertions during this *Krankel* hearing as he had during the initial *Krankel* hearing on March 4, 2024. The court noted that the allegations presented by defendant were conclusory and pertained to trial strategy. It further indicated that the appointment of new counsel was unnecessary and therefore denied the oral motion for leave to withdraw as counsel. The matter proceeded to a hearing on the amended motion for leave to withdraw guilty plea.

¶ 17    Defendant testified on his own behalf. Korando inquired about how he felt pressured by the state's attorney, and he indicated that it was because he was not allowed to review the offer. He explained that the state's attorney initially told him that it would not give him an offer, but then, when the 18-year offer was made, he was told by the state's attorney that he should be lucky to have received such an offer. Defendant indicated that the state's attorney's statement regarding his possible sentence was what pressured him to plead guilty, and that the state's attorney's conversation with the codefendant was not in his favor and violated his due process.

¶ 18    Korando then turned the direct examination of defendant to herself and asked how he felt pressured by her. Instead of responding to this inquiry, defendant complained that Korando's questioning was sarcastic. The trial court interrupted the proceedings and inquired whether defendant was comfortable testifying from his current location. Defendant affirmed that he was comfortable and reiterated that Korando was being sarcastic and not taking his case seriously. Defendant stated, "I'm not getting help by my own counsel." The trial court instructed Korando to proceed with her questioning. She resumed asking defendant how he felt pressured by her to plead guilty, and he said that it was because she told him he would be sentenced to 35 or 45 years' incarceration and that she could not assist him. Defendant stated that he had provided case law to Korando, which she did not utilize. He maintained that Korando had not visited him in jail nor

8

taken any actions expected of an attorney. Defendant acknowledged that on the day of his plea, he had admitted that no one had forced or threatened him into entering a guilty plea. Concerning his assertion of innocence, he stated that "I didn't plan or had an intent to do anything, and I didn't do anything as far as with the case."

¶ 19    Upon examination by the state's attorney, defendant testified that he spoke to the state's attorney on the morning of his plea and asked why he could not get a lesser charge "or get the same as the person that did the crime as far as me not getting an X and he getting aggravated robbery instead of armed robbery, when he the one that had the gun."

¶ 20    After hearing closing arguments, the trial court denied the motion, noting that on the date of his plea, defendant was thoroughly questioned by the court, and a factual basis for the plea was presented. The court stated that it conducted two *Krankel* inquiries into the claims of counsel's ineffectiveness. It also indicated that defendant filed his original motion to vacate and withdraw his guilty plea less than 48 hours after entering his plea. The court concluded by stating:

> "[After considering] the testimony heard today, Mr. Jordan himself, statements of
> Mr. Jordan, the Court has considered arguments of counsel, both the defense and
> the State, after considering all of these things, reviewing the record of the plea, what
> transpired in court, the motion to vacate and withdraw his guilty plea is denied."

¶ 21                                    II. ANALYSIS

¶ 22    On appeal, defendant argues that he "effectively was deprived of counsel" at the hearing on his motion to withdraw guilty plea because Korando asked him questions on direct that were aimed at showing her effectiveness as opposed to proving his assertions. He contends that an actual conflict of interest existed because Korando was placed in a position where she had to prove that she was ineffective. He claims that her questions of him on direct examination "were sarcastic and

9

self-serving and revealed a conflict of interest in representing" him and maintains that Korando's questions were not "designed to help Jordan withdraw his plea." He also asserts that after the *Krankel* hearing and the motion to withdraw guilty plea hearing, the trial court should have appointed new counsel. He concludes that he was "altogether denied the assistance of counsel" at the critical stage and that we should "presume prejudice," reverse the denial of the motion to withdraw guilty plea, and remand for a new hearing with new appointed counsel.

¶ 23    In response, the State maintains that defendant did not meet his burden to establish that an actual conflict of interest existed or that Korando's performance was adversely affected. It argues against defendant's claims that Korando failed to zealously represent him during the hearing on his motion to withdraw his guilty plea. The State maintains that defendant has no absolute right to withdraw a guilty plea and that counsel asked open-ended questions to "ferret out the crux of defendant's generalized claims." It asserts that Korando's open-ended questions provided defendant ample opportunity to criticize her performance, but he was unable to support his claim. The State requests that we affirm the trial court's decision.

¶ 24    Our analysis begins by examining whether a conflict of interest existed. "A criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation." *People v. Yost*, 2021 IL 126187, ¶ 36. Conflict-free representation means that counsel's assistance to the client is " ' "not diluted by conflicting interests or inconsistent obligations." ' " *Id.* (quoting *People v. Peterson*, 2017 IL 120331, ¶ 102, quoting *People v. Spreitzer*, 123 Ill. 2d 1, 13-14 (1988)). Illinois recognizes two types of conflict of interest: *per se* and actual. *Id.* ¶ 37. Here, defendant is not asserting that a *per se* conflict exists but rather maintains that an actual conflict of interest was present.

¶ 25    To prove an actual conflict, defendant must establish that a "conflict of interest adversely affected his lawyer's performance." (Internal quotation marks omitted.) *People v. Taylor*, 237 Ill. 2d 356, 375 (2010). " 'What this means is that the defendant must point to some specific defect in his counsel's strategy tactics, or decision making attributable to the conflict.' " *Id.* at 376 (quoting *Spreitzer*, 123 Ill. 2d at 18). In the present matter, defendant argues that case law, Korando's direct examination of defendant, and the trial court's *Krankel* hearings support the contention that Korando was operating under an actual conflict of interest. We review *de novo* whether counsel labored under a conflict of interest. *People v. Garcia*, 2018 IL App (5th) 150363, ¶ 26.

¶ 26    Our analysis commences with an examination of the cases cited by defendant. In *People v. Brown*, 2017 IL App (3d) 140921, ¶ 14, defense counsel failed to present any evidence concerning the defendant's claim of ineffectiveness and solely proceeded with a proffer. During this proffer, defense counsel effectively argued against the defendant's assertion of ineffective assistance of counsel by placing the blame on the defendant, citing a miscommunication between the two to explain her failure to call a defense witness at trial. *Id.* ¶¶ 14, 33. The trial court observed that a "miscommunication was not a 'proper basis' for setting aside a verdict" and denied defendant's motion. *Id.* ¶ 15. On appeal, the appellate court stated that counsel had "failed to make any reasonable effort with respect to either prong of the *Strickland* standard." *Id.* ¶ 33. The court determined that counsel's "performance [was] attributable to the conflict of interest inherent in arguing her own ineffectiveness." *Id.*

¶ 27    A similar situation occurred in *People v. Garcia*, 2018 IL App (5th) 150363. In *Garcia*, defense counsel pled he was ineffective in failing to object to the admission of evidence, which prejudiced the trial. *Id.* ¶ 26. During the posttrial hearing, defense counsel did not submit any evidence despite the trial court noting the necessity for more evidence. *Id.* ¶¶ 21-24. Instead,

11

counsel only offered "unsworn argument," and the trial court subsequently denied the posttrial motion. *Id.* ¶¶ 22, 24. The appellate court determined that the defendant was "denied the constitutional right to conflict-free counsel," stating in part:

> "[I]n these situations, when counsel fails to adequately assert an ineffective assistance of counsel claim on the defendant's behalf and the record indicates that counsel's failure to do so was influenced by counsel's reluctance to argue his own ineffectiveness, the defendant has been denied his constitutional right to conflict-free counsel. Under such circumstances, counsel's loyalty is divided between the defendant's interests and counsel's own self-interests. When this division in loyalty adversely affects the lawyer's performance during [a] posttrial proceeding, we are constitutionally obligated to vacate the lower court's order denying posttrial relief and remand for the appointment of conflict-free posttrial counsel and for a new posttrial hearing." *Id.* ¶ 48.

¶ 28    Reviewing the record in the present case in light of these two cases demonstrates that Korando's conflict similarly affected her performance during the motion hearing. The amended motion alleged, as to Korando, that she pressured, forced, and threatened defendant to plead guilty and that she was ineffective. At that hearing, Korando noted the possible conflict and requested the court allow her to withdraw. Upon her direct examination of defendant regarding how she pressured him, the following exchange occurred:

> "[MS. KORANDO:] Okay. Then moving on, part of your statement was you felt pressured by your own attorney to plead guilty, how did you feel pressured by me to plead guilty?

12

[DEFENDANT:] I don't understand it, how this being allowed. She's literally trying to like—you can tell her— She's really being sarcastic. Like I don't understand how this is even allowed in this courtroom then.

\* \* \*

[MS. KORANDO:] Again, you made the allegation that you felt pressure to plead guilty by me, your attorney. How did you feel pressured by me prior to entering your plea of guilty?

[DEFENDANT:] Because you told me that they was going to give me over 35 years or 45 years. They was going to take the rest of my life. And then you basically said that you couldn't help me, you weren't going to help me in the case. I asked you multiple times about a strategy toward and to help to and gave you case laws and case laws and you didn't use them at all.

[MS. KORANDO:] Okay. Other than me going over the possible penalties of this case with you, how else did you feel pressured by me, your own attorney, into pleading guilty?

[DEFENDANT:] You wouldn't help me with my case. You wasn't coming to see me. You wasn't doing none of that. You wasn't doing anything that the attorney is supposed to do.

[MS. KORANDO:] Okay. So after me visiting you multiple times in the jail and going over with you—

[DEFENDANT:] You visited me one time, that was Friday.

[MS. KORANDO:] —and having my paralegal go—

[DEFENDANT:] —two days before my trial.

13

[MS. KORANDO:] How else did you feel pressured by me, your attorney, to enter your plea of guilty?

[DEFENDANT:] You visited me one time and the other time you visit me you was at home. You didn't even explain nothing to me.

[MS. KORANDO:] All right. So after we had multiple video visits as well as multiple in-person visits and went over your case multiple times and went over the evidence with you that was provided in discovery and you viewed videos with my paralegal and she going over discovery with you, is there any other way you felt pressured by me to enter your plea of guilty?"

¶ 29   A review of this portion of the direct examination reveals that the questions posed were purposefully not asked in a manner intended for eliciting supporting information from defendant. Instead of directly inquiring, "how else did I pressure you" or "please explain in what ways you felt pressured," Korando prefaced her questions with self-serving facts. Since Korando would have been unable to defend herself against defendant's allegations, she resorted to framing her inquiries with self-serving information. The only manner in which the trial court could have been made aware that Korando reviewed the possible penalties with him, visited him multiple times, and advised him that the trial court would not be compelled to accept the plea was through incorporating such details into her questions. Korando asked defendant approximately six times how she pressured him, and of those six instances, half were preceded by self-serving statements. Including such self-serving information effectively undermined defendant's assertion that Korando pressured him into pleading guilty and put the blame back on him, as in *Brown*.

¶ 30   In addition to including self-serving statements in her questions, Korando failed to follow up on defendant's responses or seek further clarification regarding his answers. She did not afford

14

him the opportunity to elaborate in detail on his assertions, nor did she assist him in doing so by following up his answers with probing questions. Instead, she repeatedly posed the same question of how she pressured him rather than building upon the answers provided by defendant. "As a general rule, questions posed to witnesses should be in a form designed to elicit admissible facts." 11 Timothy J. Storm, Illinois Practice, Courtroom Handbook on Illinois Evidence § 611(c):2 (May 2025 Update). However, the questions asked by Korando were constructed and presented in a manner intended to place defendant on the defensive, rather than to gather supporting facts for his motion.

¶ 31    In relation to defendant's allegation that he felt forced or threatened to plead guilty, the following exchange occurred:

"[MS. KORANDO:] Do you recall on August the 28th of 2023, and this is indicated on page 9 of the transcript, do you recall the judge asking you: Did anybody force or threaten you in this decision today?

[DEFENDANT:] And my counsel advised me not to say nothing, so I was forced to not say nothing.

[MS. KORANDO:] And do you recall that day replying to the judge's question by saying 'No, sir'?

[DEFENDANT:] But did you not say— You told me— Did you or did you not say not to say nothing?

[MS. KORANDO:] Okay. Again, I'm not the one being questioned here. I'm asking you if you recall your answer to the Court that day being 'no, sir'?

[DEFENDANT:] Because I was advised to by my counsel.

[MS. KORANDO:] Okay. Yes or no. Do you recall saying that?

15

[DEFENDANT:] That's my answer.

[MS. KORANDO:] Okay. So after you answered no, sir, to the Court's inquiry about anyone forcing or threatening you in that decision, and that answer was given not under oath, now that you are under oath today as a witness what would your answer to that question be?

[DEFENDANT:] Yes."

¶ 32 Korando's questions in this particular instance were adversarial, resembling the inquiries typically made by a prosecutor. This approach undermined defendant's assertion that he felt forced or threatened into pleading guilty. As defendant's attorney, Korando is expected to advocate zealously on defendant's behalf and assist in establishing that he was forced or threatened into accepting the plea. Conversely, however, the questions posed by Korando had the opposite effect and ultimately advantaged the State more than defendant.

¶ 33 In addition to his assertions that he felt pressured, forced, and threatened to plead guilty, defendant claimed in the amended motion that he received ineffective assistance from counsel throughout the case. "Claims of ineffectiveness of counsel are judged under the familiar standard set forth in *Strickland*." *People v. Manning*, 241 Ill. 2d 319, 326 (2011). The *Strickland* standard requires a defendant to "show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* However, during the direct examination of defendant regarding this issue, Korando did not address it at all. More specifically, she stated:

"We've gone over the allegation in the amended motion to withdraw the defendant's guilty plea and vacate the judgment regarding your belief that you have

16

received ineffective assistance of counsel, and I believe we have established that for the record in our multiple *Krankel* inquiries that the Court has conducted."

¶ 34 It was at this point that she moved on and proceeded to address the fourth assertion made by defendant, that he was innocent of the charge. She did not ask him a single question regarding how he felt that she was ineffective. Korando essentially ignored this issue, made no effort during the motion hearing to investigate or demonstrate her own ineffectiveness, and did not make any effort to show either prong of *Strickland*. "When counsel raises the issue of counsel's own ineffectiveness, counsel has a duty to zealously represent the client in arguing that issue." *People v. Salamie*, 2023 IL App (2d) 220312, ¶ 64. Although the court conducted two *Krankel* hearings, during which defendant and Korando were permitted to present their perspectives on Korando's representation, Korando, as defendant's advocate, reasserted the claims in an amended motion to withdraw his guilty plea. She therefore had a duty to zealously represent defendant in arguing her ineffectiveness at the motion hearing. She did not do so. Korando's "failure to present evidence was attributable to [her] reluctance to prove [her] own ineffectiveness" *Garcia*, 2018 IL App (5th) 150363, ¶ 42.

¶ 35 Korando's examination of defendant did not afford him an opportunity to sufficiently provide testimony as to how she threatened and pressured him into pleading guilty, nor did she even address her ineffectiveness. Defendant was placed on the defensive by Korando instead of being zealously represented. We agree with defendant that Korando's questions were argumentative, self-serving, and did not provide sufficient opportunity for him to substantiate his claims. Similar to the defense counsels in *Brown* and *Garcia*, Korando was "reluctant to cast blame on [her]self." *Salamie*, 2023 IL App (2d) 220312, ¶ 69. We find that Korando's performance was negatively affected by an actual conflict of interest, resulting in her failure to advocate zealously

17

for defendant during the hearing. Therefore, we vacate the trial court's denial of defendant's amended motion to withdraw guilty plea and remand to the trial court for appointment of conflict-free counsel, who will then have the opportunity to file a new postplea motion. Since we find an actual conflict of interest existed, we need not address defendant's contentions regarding the "net effect" of the *Krankel* hearings and Korando's 604(d) affidavit.

¶ 36                                    III. CONCLUSION

¶ 37     For the above-stated reasons, we find that defense counsel harbored an actual conflict of interest, effectively depriving defendant of his right to counsel at the postplea hearing. We vacate the trial court's denial of defendant's amended motion to withdraw guilty plea and remand to the trial court for appointment of conflict-free counsel.


¶ 38     Order vacated; cause remanded with directions.