2023 IL App (2d) 220312
No. 2-22-0312
Opinion filed September 27, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) )  ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-602 |
| REBECCA R. SALAMIE, | ) ) | Honorable Philip G. Montgomery, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE KENNEDY delivered the judgment of the court, with opinion.
Justices Hutchinson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Rebecca R. Salamie, appeals from the denial of her motion to withdraw her plea of guilty and vacate the judgment. She raises two issues: (1) whether the mental health court committed plain error when, before accepting modified sentencing terms of her negotiated guilty plea, it failed to admonish her in accordance with Illinois Supreme Court Rule 402 (eff. July 1, 2012) and, (2) alternatively, whether defendant's postplea attorney had a conflict of interest, either *per se* or actual, in arguing her motion to withdraw her guilty plea.

¶ 2     We reject defendant's argument on the first issue, holding that the mental health court was not required to substantially comply with Rule 402 at the hearing where it accepted the parties' agreement to modify the sentencing terms of defendant's plea. On defendant's alternative

argument, we hold that defense counsel was operating under an actual conflict of interest in arguing defendant's motion to withdraw her guilty plea. We therefore vacate the trial court's order denying defendant's motion and remand for the appointment of conflict-free counsel and new postplea proceedings.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant, who is hearing impaired, was indicted on December 6, 2019, on two counts of domestic battery (720 ILCS 5/12-3.2(a)(1), (2) (West 2018) (Class 4 felony)) and one count of interfering with the reporting of domestic violence (*id.* § 12-3.5(a) (Class A misdemeanor)). Count I alleged domestic battery in that defendant knowingly caused bodily harm to Tim Cook, a family or household member, when she flailed her arms and caused a scratch on his forehead. *Id.* § 12-3.2(a)(1). Count II alleged domestic battery in that defendant knowingly made contact of an insulting or provoking nature with Cook when she kicked his legs in an attempt to trip him. *Id.* § 12-3.2(a)(2). Both domestic battery counts further alleged that defendant previously had been convicted of domestic battery in De Kalb and Lee Counties. All three offenses allegedly occurred on November 7, 2019, in De Kalb County.

¶ 5                                    A. Guilty Plea

¶ 6      In the approximately 22 months after the indictment, the proceedings were repeatedly continued due not only to the COVID-19 pandemic but also by extended efforts to move the case toward mental health court. For example, on November 2, 2020, defendant's public defender advised the trial court that defendant was "filling out the packet"; on February 1, 2021, he advised that she was not in the program yet; and on March 15, 2021, he relayed that "we're trying to get her through the program." On May 10, 2021, counsel advised the court that defendant "has been accepted into the program" and on June 21, 2021, he reported that they had just secured a date for

assessment. However, on July 30, 2021, defendant, who used a sign language interpreter for court proceedings, expressed to the court, "I don't agree with the recommendation that they have given me." The court responded that it was defendant's decision and "no one is going to hold it against you because you don't have to get involved in the program. Ultimately, it's your call." On August 27, 2021, defense counsel advised the court, "After much discussion with the team and Ms. Salamie and myself, I think we're going to have a negotiated plea," and he asked for a plea date.

¶ 7 On October 6, 2021, defendant appeared. Counsel stated that defendant had agreed to plead guilty to one count of felony domestic battery, with the State dismissing the other two charges. A condition of defendant's plea agreement was that, if she successfully completed the mental health court's treatment program, her felony conviction would be vacated and a misdemeanor domestic battery conviction would be entered. If she were unsuccessfully discharged from the mental health court program, she would be sentenced to two years' imprisonment.

¶ 8 Additional terms of the plea agreement were that defendant would complete the Partner Abuse Intervention Program, avoid contact with Cook, and be placed under electronic home monitoring for 21 days. The State agreed that the terms of the plea agreement were correctly stated.

¶ 9 Defendant stated that she understood the plea agreement. She confirmed, *inter alia*, that she was 40 years old, that she understood what was occurring that day, and that she was not under the influence of drugs, alcohol, or medication that would affect her ability to understand the proceedings. The trial court admonished her that, in pleading guilty, she could be sentenced to one to three years' imprisonment or, if eligible for an extended term, up to six years. In addition to a prison sentence, she would receive four years' mandatory supervised release (MSR) and could be fined up to $25,000. Defendant responded that she understood the sentencing range she would face.

¶ 10   The trial court admonished defendant of her rights, including her right to a jury trial, right to testify, and right to be confronted with witnesses against her. Defendant asked for clarification of several rights, including her right to a sentencing hearing, and, after the trial court explained those rights, defendant stated that she understood those rights and all the other rights mentioned. She further stated that it was her desire to plead guilty and that no one had coerced her to plead or promised her anything for her plea.

¶ 11   The State provided the factual basis for the plea as follows. "Witnesses" would testify that on November 7, 2019, they were called to Cook's residence, where Cook told them that he was in a dating relationship with defendant and that she had come to the residence and had begun yelling. Cook told her to stop, and he tried to call the police. Defendant attempted to take the phone from him and flailed her arms at him, causing a scratch on his forehead. Defendant also had a prior domestic battery conviction from 2016.[1]

¶ 12   Counsel confirmed that the State's factual basis would be defendant's stipulation for her plea. He further stated that he had spent two hours going over all of the accompanying documentation with defendant, through the aid of an interpreter. Counsel added that the recommendation would be for inpatient treatment, with facilities to be determined by the treatment team. Defendant signed and submitted 13 documents, including a "Guilty Plea and Jury Waiver,"

---

[1] The record reflects that defendant had previously been convicted of two misdemeanor domestic batteries (in addition to a prior term of supervision for a battery that had been reduced from a domestic battery pursuant to a plea agreement). Additionally, defendant was still on conditional discharge for the 2016 case at the time of the instant offense.

a "De Kalb County Mental Health Court Judgment," a "Consent to Participate Mental Health Court Program,"[2] and various consent forms related to the program.

¶ 13    The trial court found a factual basis for the plea, and it found that defendant had entered the plea agreement knowingly and voluntarily. The court accepted the plea.[3]

¶ 14    The trial court informed defendant that it believed she could successfully complete the mental health treatment program and that it wanted her in the program because it believed a treatment team could help her. Defendant stated that she would follow the recommendations of the mental health court, and, pursuant to the parties' agreement, the court placed her in a mental health court treatment program. The court stated that, if defendant failed to successfully complete the program, she would be sentenced to two years' imprisonment. If she successfully completed the program, the charge against her would be amended to a misdemeanor offense.

¶ 15    The court entered a written "De Kalb County Mental Health Court Judgement" order on defendant's plea of guilty to felony domestic battery, which recommended inpatient treatment/placement. The judgment order stated that defendant "understands and agrees" that, if she were "unsuccessfully terminated from the program for any reason, the case shall proceed to the sentencing hearing pursuant to the plea and predetermined sentence." The judgment order was signed by defendant, her counsel, the assistant state's attorney, and the court.

---

[2] This document begins with "I understand that I have no legal right to participate in the Mental Health Court Program."

[3] At the plea hearing, neither the trial court nor the parties specified to which count of domestic battery defendant was pleading guilty, but the following day the court clarified in a separate order that defendant's plea was to count I and that counts II and III were nol-prossed.

¶ 16    The trial court then reviewed several documents with defendant, beginning with her signed consent to participate in the mental health court program. Defendant stated that she understood the consent document and what it entailed.

¶ 17    Following entry of defendant's plea, defendant appeared 18 times in the mental health court, which was presided over by the same judge who took defendant's plea in the trial court. Defendant successfully completed her electronic home monitoring and passed her drug tests. At many of these appearances, either the mental health court or a member of its treatment team informed defendant that they had been unable to secure her treatment or services. When defendant asked the court on November 12, 2021, whether she was going to inpatient treatment, the court responded, "It's a bit of a process. *** [I]t's not going to be something that just happens overnight." On December 10, 2021, a mental health court officer informed defendant that they were working on hiring a counselor and asked defendant to be patient. On December 17, 2021, the court told defendant that "you're kind of in a weird spot here, because we haven't quite gotten all the services that you need set up, but we're working on it." The mental health court officer added that "there are some waiting periods [for inpatient services and] I am working on an assessment over the phone."[4] At that time, the plan changed to attempting to find a partial hospitalization program for defendant to attend while waiting for an opening for inpatient treatment, but that did not materialize either. On January 7, 2022, the court again told defendant that she was "in a weird spot *** in the program. You know we're trying to get the assistance that you need *** but obviously, you are one of our more unique participants." This continued through multiple

_____

[4] There was no indication how "an assessment over the phone" would work, given defendant's disability.

appearances over the next few months, with repeated assurances from the court, telling her that the team was "working behind the scenes trying to get you set up with services [and] alternative approaches" (January 28, 2022), "working diligently" but adding that "[o]bviously you present some unique challenges" (February 4, 2022), and "working on any number of resources to try and assist you in your unique situation" (February 18, 2022).

¶ 18    On February 25, 2022, the mental health court told defendant that the treatment team was finally able to set an appointment with her case manager in March. Defendant acknowledged the appointment, but she said that she was "not going to be able to go to group or therapy, that's what they told me ***. I think it's better for me to go to prison than this." The court responded that the mental health court treatment program was voluntary and that it was her decision whether to withdraw from it. However, the court encouraged her to "at least go to this appointment so we can get a case manager assigned to your case so that they can assist you." Defendant replied that "[t]hey don't have the services that I need. The case manager *** was already doing that to find someone."

¶ 19    On March 11, 2022, the mental health court stated that "[w]e're trying to figure out how best to assist you" and told defendant that counsel would be speaking with the State about how to proceed. The court noted that the attorneys had different ideas for assisting her going forward and that it was going to give them more time to speak. On March 18, 2022, the court stated to defendant:

> " [Defense counsel] gave me an update, so things are going to be just slightly different.
>
> I know [counsel] has kind of explained to you your options. Ultimately it's up to you to decide what you want to do.

I would encourage you to listen to [counsel]. He's a long-time lawyer, he knows what he's doing. He's given you good advice, okay?

But ultimately you're going to have to make up your mind, and we're going to give you until April 1st to decide what to do, okay?"

¶ 20    The parties reconvened on April 1, 2022. The mental health court began the hearing by noting that defendant had been in the mental health court program since November 2021. It stated that the court and its team had attempted to find defendant accommodations to help her deal with her mental health issues but that they were unable to provide her with the services that she needed through no fault of her own. As a result, it was discharging defendant from the mental health court program "neutrally," meaning "she didn't do anything wrong." The court placed her on conditional discharge. The court then admonished defendant that she had appeal rights, stating that, if she wished to appeal, she had to first "file with the trial court within 30 days of today's date a written motion to *withdraw your plea of guilty*." (Emphasis added.) After admonishing defendant of her appeal rights, the court apologized: "I'm sorry that we could not meet your needs." Defendant responded, "It's all right," and added that she "wanted to say something to the State, too. Thank you to the State for the offer."[5]

¶ 21    That same day, the court entered a written order of conditional discharge, which provided that defendant was "neutrally discharged" from the mental health court by agreement. The terms

---

[5]Although not explicitly mentioned by the mental health court, as reflected in the report of proceedings from April 1, 2022, defendant's conditional discharge was the result of her accepting the State's offer to modify the sentencing terms of her plea agreement, as stated in defendant's April 25, 2022, motion to withdraw her guilty plea and vacate the judgment. See *infra* ¶ 26.

of defendant's conditional discharge were that she would remain on conditional discharge until September 30, 2022, "pay her $75 fine," and submit to DNA indexing, with "[a]ll other obligations waived." Defendant signed the order to confirm that she understood the order's terms.

¶ 22                    B. Motion to Withdraw Guilty Plea

¶ 23    On April 25, 2022, defendant, through counsel, filed a motion to withdraw her guilty plea and vacate the judgment.

¶ 24    Defendant's motion requested the trial court to vacate the judgment and allow her to withdraw her October 6, 2021, guilty plea, "or, in the alternative, to allow her to withdraw her acquiescence to the amended sentence entered into on April 1, 2022, and place her back into Mental Health Court." The motion stated that, during defendant's time with the mental health court, she never attended any treatment program, because the mental health court team had been unable to secure treatment for her in a timely fashion. The motion noted that defendant was deaf and alleged that the wait list for residential programs for the hearing impaired was "years long."

¶ 25    The motion contended that, had defendant been provided treatment, she would have successfully completed the mental health court program, which would have resulted in the vacation of her felony domestic battery conviction and the entry of a misdemeanor conviction. Instead of this result, defendant was neutrally discharged from the mental health court and, on April 1, 2022, she entered into an agreed sentence whereby she would be on six months' conditional discharge for the Class 4 felony domestic battery. Defendant argued that she was not given an opportunity to receive the benefit of her original plea agreement.

¶ 26    The motion continued that, when the mental health court neutrally discharged defendant from the mental health court program, neither the court nor the attorneys understood "what exactly a 'Neutral Discharge' consisted of" and that defining this term was "a novel issue to all." In their

discussions outside defendant's presence, the court and the attorneys contemplated that a neutral discharge likely would consist of either defendant standing on her guilty plea and receiving an open sentence on the plea or the court giving her the opportunity to withdraw her plea and set the matter for trial. The motion argued that, "[t]o be clear, this was not a choice given to Defendant" and had defendant been given the choice between those two options, she "informed counsel in no uncertain terms," she would have chosen to withdraw her plea. Instead, counsel informed defendant that, to definitively determine what a neutral discharge meant, she would have to request a hearing on the matter.

¶ 27    The motion argued that, as a result of "[n]ot wanting to risk being in front of the Court on a blind plea, [defendant] chose the always available third option of renegotiating with the State, and thereafter accepted the State's 6-month Conditional Discharge offer." Nevertheless, the motion continued, under *People v. Whitfield*, 217 Ill. 2d 177 (2005), there were only two possible remedies for when a defendant does not receive the benefit of her plea bargain: either the plea agreement had to be fulfilled by receiving treatment through the mental health court or she had to be given the option to withdraw her plea.

¶ 28    The motion asserted that, "[i]n addition to being misinformed about what her options were," defendant felt "rushed" into accepting the State's offer of conditional discharge. The motion noted that the sign language interpreter was a half-hour late to the April 1, 2022, hearing, and it asserted that defendant was afraid to ask the court for a continuance.

¶ 29    Finally, the motion stated that "[d]efendant and her counselor had numerous email discussions regarding her options, including the State's offer for Conditional Discharge, in the days and weeks prior to her court date on April 1, 2022." The motion asserted that it was during those discussions that defendant "decided to accept the State's amended offer." Defendant's

motion requested that her plea be withdrawn or, in the alternative, that she be placed back in the mental health court.

¶ 30 Defense counsel filed an affidavit on June 14, 2022, to supplement defendant's motion to withdraw her guilty plea. In pertinent part, counsel stated that he, the prosecutor, and the judge had "briefly discussed what a Neutral Discharge would likely consist of and came up with one of two likely options being imposed by the Court." Counsel described the first option as having defendant's mental health court sentence "revoked," with her guilty plea remaining intact and being in front of either the mental health court or the trial court "on an open or blind plea on the Class 4 Domestic Battery." The second option was that defendant could "be given the opportunity to withdraw her plea and set the matter for trial." Counsel further averred that he had "numerous email discussions" with defendant prior to the April 1, 2022, hearing, including discussing a third option of taking the State's offer of conditional discharge. During those discussions, defendant decided to accept the State's offer of conditional discharge.

¶ 31 On June 29, 2022, the trial court heard defendant's motion to withdraw her guilty plea, which counsel argued. Regarding defendant's neutral discharge from the mental health court program, counsel stated that he spoke with defendant about her options of withdrawing her plea or receiving a blind sentence on her plea, and he said that he also spoke with the State about a "third option of just negotiating a different disposition," which was the option that defendant ultimately took.

¶ 32 Counsel argued that, when defendant decided to take the State's offer of conditional discharge, "she did that with her understanding that one of the potentials for a neutral discharge could be that it's simply a blind plea," and he said that he did not believe that should have been an option upon a neutral discharge. He argued that defendant's options were that the trial court should

either send her back to the mental health court's treatment program or vacate her plea. Counsel acknowledged that sending defendant back to the mental health court was not an effective option. He contended, therefore, that the only option was to allow her to withdraw her plea.

¶ 33    After counsel's main argument, the trial court stated, "in essence, ultimately what this comes down to is, to me, you guys reopened negotiations, [and defendant] decided to plead guilty to a Class 4 domestic battery." Counsel agreed, saying, "We reopened and she—we renegotiated and she accepted that offer." Counsel continued:

> "I think she did that, though, in part because one of the things that she was told was that one of these things that could happen is you're in front of the judge on a blind plea, and he could sentence you for one day of conditional discharge up to three years in the Illinois Department of Corrections, and I don't think that was an available option.
>
> I think on a neutral discharge, I don't think it is a blind plea. I think given where we were, because she did not get the benefit of her bargain, *** I don't think that was an option.
>
> So I think she made that decision based on—I don't want to say bad advice, but on some faulty potential, I guess I would say."

¶ 34    On August 16, 2022, the trial court denied defendant's motion to withdraw her guilty plea. In denying the motion, the court stated that defendant "was not re-advised of her rights on April 1, 2022, because she had previously entered a plea of guilty on the offense for which the amended sentence was ordered." This timely appeal followed.

¶ 35                                II. ANALYSIS

¶ 36                          A. Rule 402 Admonishments

¶ 37    Defendant argues that the mental health court committed plain error by failing to admonish her pursuant to Illinois Supreme Court Rule 402 (eff. July 1, 2012) when she agreed to a modification of the terms of her plea. Defendant acknowledges that the trial court properly admonished her pursuant to Rule 402 before accepting her negotiated plea on October 6, 2021, but she contends that the mental health court was required to admonish her again before accepting her modified plea to a sentence of conditional discharge. Defendant also acknowledges that "the admonishments required by Rule 402(a) are not well tailored to a situation where a plea modification is brought about by the State's inability to follow through on a defendant's original bargain." Relying on *Whitfield*, 217 Ill. 2d at 202, defendant argues that, nevertheless, the mental health court should have explained to her that she had the choice to either withdraw her plea or accept the modified terms offered by the State. Defendant continues that the court also failed under Rule 402(b) to make a record of the new terms and ascertain whether her acceptance of the terms was knowing and voluntary.

¶ 38    Defendant further argues that the mental health court's failure to admonish her at the April 1, 2022, hearing, caused her prejudice. That is, had the court admonished defendant on her modified, "any false threats [defendant] was operating under could have come to light before her plea was accepted."

¶ 39    The State responds that defendant did not require Rule 402 admonishments at the April 1, 2022, hearing, because she had previously entered a plea of guilty on the same offense for which she received the amended sentence of conditional discharge. Thus, the State concludes, there was no error for purposes of the plain-error doctrine. We agree with the State.

¶ 40    The first step in a plain-error analysis is to determine whether a clear or obvious error occurred. *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010). When a court fails to give the required

admonishments under Rule 402, that failure can amount to plain error. *People v. Fuller*, 205 Ill. 2d 308, 322 (2002). Of course, if the court was not required to admonish the defendant under Rule 402, no error, and thus no plain error, occurred.

¶ 41    Whether the mental health court had to admonish defendant under Rule 402(a), as well as whether it had to make determinations under Rule 402(b), requires that we interpret the rule. When interpreting supreme court rules, we apply the same principles as we would in statutory construction. *People v. Dougherty*, 394 Ill. App. 3d 134, 137 (2009). Our primary goal is to ascertain and give effect to the supreme court's intent, and the most reliable indicator of that intent is the language of the rule given its plain and ordinary meaning. *People v. Gorss*, 2022 IL 126464, ¶ 10. We consider the plain language of each part of the rule in relation to the rest of the rule. *Dougherty*, 394 Ill. App. 3d at 137. Where the language is plain and unambiguous, we should not depart from the plain language by reading into the rule exceptions, limitations, or conditions that conflict with the drafter's intent. *Gorss*, 2022 IL 126464, ¶ 10. The interpretation of a supreme court rule is a question of law, which is reviewed *de novo*. *Id.*

¶ 42    Illinois Supreme Court Rule 402 (eff. July 1, 2012) begins, "*In hearings on pleas of guilty*, or in any case in which the defense offers to stipulate that the evidence is sufficient to convict, there must be substantial compliance with the following: ***." (Emphasis added.) Then, 402(a) lists four admonishments that the court must provide a defendant *before accepting a guilty plea*: (1) the nature of the charge, (2) the minimum and maximum sentence prescribed by law, (3) the defendant's right to plead not guilty, persist in a plea of not guilty, or plead guilty, and, (4) if the defendant pleads guilty, the defendant waives the right to a trial by jury and to be confronted with witnesses against the defendant. Ill. S. Ct. R. 402(a) (eff. July 1, 2012). Next, Rule 402(b) requires that the court determine whether *the guilty plea* is voluntary. Ill. S. Ct. R. 402(b) (eff. July 1, 2012).

Further requirements include that the court determine that there is a factual basis *for a guilty plea*. Ill. S. Ct. R. 402(c) (eff. July 1, 2012).

¶ 43    Under the plain language of Rule 402, the rule applied to defendant's guilty plea but not to her postplea agreement to modify the sentencing terms of her plea. On October 6, 2021, defendant pled guilty to a Class 4 domestic battery, and she concedes that the trial court substantially complied with Rule 402(a) and (b) at that hearing. On April 1, 2022, defendant did not plead guilty again. Instead, she agreed to the State's offer of conditional discharge as a *modification* to the terms of her sentence under her original guilty plea. Importantly, defendant had already waived her rights related to her plea, including her right to a jury trial and to be confronted with witnesses. Thus, the mental health court was not required to re-admonish defendant of rights that she had already waived or to redetermine that her plea had been voluntary. Indeed, problem solving courts have been described as "postplea, presentence" courts because they offer an opportunity to a defendant to reduce or vacate a sentence that has already been imposed. Here, the trial court entered judgment on defendant's guilty plea on October 6, 2021, and entered a sentencing order at the same time sentencing her to two years in the Illinois Department of Corrections, "subject to vacating upon graduation" from mental health court. The April 1, 2022, proceeding was merely a modification of the October 6, 2021, sentencing order, for which the court had no duty to re-admonish defendant as if she were pleading guilty then.

¶ 44    As to defendant's argument that the mental health court should have explained to her that she could move to withdraw her plea, nothing in the plain language of Rule 402 requires that a court admonish defendants of the option to move to withdraw their plea, except in the limited circumstance where a trial court withdraws its concurrence in a proposed disposition to a

defendant's guilty plea. See Ill. S. Ct. R. 402(d)(2) (eff. July 1, 2012). Such circumstance is not before us.

¶ 45    At oral argument, counsel for defendant directed us to sections 9.2 and 9.4 of the Problem-Solving Courts Standards (PSC Standards). See Admin. Office of the Ill. Courts, Problem-Solving Courts Standards (rev. Nov. 2019), available at https://www.illinoiscourts.gov/Resources/ a4b9d77c-b014-4174-b011-21a4ccd90521/PSC_Standards_2019.pdf [https://perma.cc/U3CG-ES3K]. Counsel argued that these standards demonstrated that the mental health court should have done more to admonish defendant before accepting the modified terms of her plea at the April 1, 2022, hearing. Counsel did not include such argument in her brief and did not move to supplement her brief. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised *** in oral argument ***.").

¶ 46    Even if the argument were not forfeited, the PSC Standards do not support that the mental health court was required to further admonish defendant. We first note that section 9.4 is unhelpful in that it addresses a voluntary withdrawal, which did not occur here.

¶ 47    Per section 9.2 of the PSC Standards, "[s]uccessful and neutral discharge decisions shall be made by the PSC Team collaboratively." Admin. Office of the Ill. Courts, *supra* § 9.2. The record demonstrates that this occurred. After it became clear that the mental health court would be unable to place defendant with a mental health treatment facility on an inpatient basis per the original plea agreement, the court discussed options with the attorneys and provided the parties time to negotiate an amended sentence. The court discharged defendant from the mental health court program only after the parties agreed to six months' conditional discharge. Further, the commentary on section 9.2 provides that a "[n]eutral discharge is an event that does not require elaborate planning as to the manner in which it is accomplished." *Id.* § 9.2 cmt. at 34. Thus, section

9.2 does not support counsel's contention that the mental health court erred by not doing more to admonish defendant of the consequences of her neutral discharge.[6]

¶ 48    Turning to defendant's citation to *Whitfield*, we find defendant's reliance on that case misplaced. When our supreme court stated that defendants who do not receive the "benefit of the bargain" may have either the State's promise fulfilled or the opportunity to withdraw their plea, the court was not speaking to Rule 402's required admonishments; it was speaking to the appropriate *remedy* for when the court fails to admonish a defendant under Rule 402. See *Whitfield*, 217 Ill. 2d at 201-02. In *Whitfield*, the defendant was promised a 25-year sentence in exchange for his guilty plea to murder, but he was never advised that he would additionally receive a three-year MSR term, which resulted in the defendant receiving a more onerous sentence than he was told he would receive. *Id.* at 201. The supreme court held that the failure to admonish the defendant of the three-year MSR term violated Rule 402 and his constitutional right to due process. *Id.* at 202. The supreme court determined that the "appropriate remedy" for the defendant not receiving the benefit of his bargain with the State was to modify the defendant's sentence from 25 years' imprisonment to 22 years' imprisonment followed by three years' MSR. *Id.* at 205.

¶ 49    Unlike the defendant in *Whitfield*, defendant admits that she received proper Rule 402 admonishments when she pled guilty to a Class 4 domestic battery. We acknowledge that

---

[6] Our conclusion does not imply that PSC Standards create rules where the court's failure to comply with those standards constitutes error. Nor should our conclusion dissuade courts from providing defendants with more information at the time of a neutral discharge. We encourage trial courts to, as a best practice, inform defendants on the record of their options upon a neutral discharge from a problem-solving court, including the option to move to withdraw a guilty plea.

defendant was unable to fulfill the sentencing condition of her original plea agreement through no fault of her own; however, she agreed to modify the sentence that was entered pursuant to the terms of her original plea. In other words, when defendant believed she would not receive the benefit of her original bargain, she accepted a modified bargain on the same guilty plea. The court in Whitfield found that it was appropriate for the trial court to unilaterally modify the defendant's sentence although the defendant had not properly been admonished. Thus, we see no due process concern here, where defendant *had* been properly admonished at the time of her guilty plea and later agreed to modify her sentence. We hold that Rule 402 does not require a court to re-admonish a defendant when the defendant agrees to modify a sentence previously agreed to, so long as proper admonitions had been given at the time of the defendant's guilty plea.

¶ 50    To be sure, defendant did not receive the mental health treatment that she had agreed to and that all parties agreed was necessary and would be beneficial for defendant. A problem-solving court's failure to provide a reasonable accommodation for a defendant's disability is a problem. We are mindful of the challenges the COVID-19 pandemic posed for the entire justice system. However, as to the extended failure to accommodate a person with disabilities, such as happened here, lower courts are not without recourse in seeking an explanation; they can inquire of county and court personnel, community mental health care providers, and others responsible for administering and funding such programs—or, if necessary, to compel testimony—to explain the failure to accommodate a person with disabilities for an extended period of time, such as happened here. Contrary to the court's repeated statements to defendant in this case, hearing impairment is not "a unique situation" for courts or mental health providers, who commonly provide reasonable accommodations for all manner of disabilities and are not to be excused from doing so without justification.

¶ 51　　Regardless, the mental health court was not required to substantially comply with Rule 402 at the April 1, 2022, hearing, and it therefore did not commit any error for purpose of plain error.

¶ 52　　　　　　　　　　　　　　　B. Conflict of Interest

¶ 53　　Defendant argues in the alternative that the trial court's denial of her motion to withdraw her guilty plea should be vacated because her counsel was operating under a conflict of interest on her motion to withdraw. That is, counsel represented defendant both in agreeing to a modified sentence of conditional discharge and in moving to withdraw that agreement, and the basis for her motion was that counsel had provided her incorrect information in advising her to accept the modified sentence. The purported incorrect information was counsel's advice that defendant had three options upon her neutral discharge: (1) withdraw her plea, (2) renegotiate her plea, or (3) stand on her guilty plea and receive an open sentence. She argues that the third option was not a legally viable option but that the possibility of a "blind plea" coerced her into accepting the State's offer of conditional discharge, which entailed a felony conviction without the possibility of receiving a reduction to a misdemeanor. Defendant notes that Illinois Supreme Court Rule 604(d) (eff. July 1, 2017) requires that counsel be free from conflict, and she contends that a conflict arose here when counsel implicitly raised his own ineffectiveness in her motion to withdraw her guilty plea. Further, she argues that whether a conflicted attorney's performance prejudiced the defendant need not be shown but instead is presumed. In support, she directs us to *People v. Norris*, 46 Ill. App. 3d 536 (1977), *People v. Willis*, 134 Ill. App. 3d 123 (1985), and *People v. Williams*, 176 Ill. App. 3d 73 (1988). She continues that, even if a showing of prejudice is required, she was prejudiced because counsel was operating under an actual conflict of interest when he argued that he gave defendant incorrect legal advice that affected her acceptance of the modified sentence of conditional discharge.

¶ 54   The State responds that counsel was not acting under a *per se* or an actual conflict of interest. It argues that *per se* conflicts of interest are limited to three situations and none applies here. The State continues that, to determine whether an actual conflict of interest existed, we must look to the underlying allegation of incompetence. The State contends that, on defendant's motion to withdraw her plea, counsel zealously asserted a claim of ineffective assistance on her behalf. The State further argues that the supreme court in *Whitfield* recognized three, not two, remedies when defendants do not receive the benefit of their bargains: (1) allow the defendant to withdraw the plea, (2) fulfill the promise by ordering specific performance, or (3) order a different sentence when specific performance would be infeasible. The State concludes that, even if counsel provided erroneous advice, defendant was not prejudiced.

¶ 55   We agree with the State that counsel was not operating under a *per se* conflict of interest when he argued defendant's motion to withdraw her plea. However, as explained herein, we agree with defendant that counsel was laboring under an actual conflict of interest.

¶ 56   The right to effective assistance of counsel guaranteed by the sixth amendment includes the right to conflict-free representation. *People v. Green*, 2020 IL 125005, ¶ 20. Conflict-free representation means that counsel's assistance to the client is "not diluted by conflicting interests or inconsistent obligations." (Internal quotation marks omitted.) *People v. Yost*, 2021 IL 126187, ¶ 36. A conflict-of-interest claim is a specific form of an ineffective-assistance claim, where, essentially, the defendant asserting such a claim is arguing that a conflict rendered counsel's performance substandard and that counsel's substandard performance prejudiced the defendant. *In re Br. M.*, 2021 IL 125969, ¶ 44. Unlike a *Strickland* ineffective-assistance claim, prejudice in a conflict-of-interest claim does not require a showing that the outcome of a proceeding was affected; it requires a showing only that counsel's performance was adversely affected by the

conflict. *People v. Austin M.*, 2012 IL 111194, ¶ 82 ("In actual conflict situations the accused need not prove prejudice in that the conflict contributed to the conviction, but it is necessary to establish that an actual conflict of interest adversely affected the lawyer's performance."). We review *de novo* whether counsel labored under a conflict of interest. *People v. Garcia*, 2018 IL App (5th) 150363, ¶ 26.

¶ 57    Our supreme court has recognized two categories of conflicts of interest: *per se* and actual. *Green*, 2020 IL 125005, ¶ 20. A *per se* conflict of interest does not require a defendant to establish that counsel's performance was affected by the conflict. *People v. Hernandez*, 231 Ill. 2d 134, 143 (2008). When a *per se* conflict exists, automatic reversal of the criminal conviction is required unless the defendant waived the right to conflict-free counsel. *Yost*, 2021 IL 126187, ¶ 39 (citing *Green*, 2020 IL 125005, ¶ 24). "Generally, a *per se* conflict arises when defense counsel has a connection to a person or entity that would benefit from an unfavorable verdict for the defendant." *Id.*

¶ 58    Illinois case law currently recognizes only three categories of *per se* conflicts of interest:

"(1) when defense counsel has a contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) when defense counsel contemporaneously represents a prosecution witness; and (3) when defense counsel was a former prosecutor who was personally involved in the prosecution of the defendant." *Id.* ¶ 66.[7]

---

[7] Prior to the *Yost* decision, our supreme court had stated that the first category where a *per se* conflict exists was when defense counsel has a contemporaneous *or prior* association with the victim, the prosecution, or an entity assisting the prosecution. *Hernandez*, 231 Ill. 2d at 143.

¶ 59    Defendant admits that none of the three *per se* conflict categories is present in this case. Nevertheless, she argues that prejudice should be presumed based on the reasoning of three appellate court decisions. We reject this argument.

¶ 60    Our supreme court precedent is clear that *per se* conflicts of interest are limited to three categories and, if an asserted conflict falls outside those categories, a defendant must show an actual conflict of interest; that is, they must show prejudice in that counsel's performance was adversely affected by a conflict. See *Yost*, 2021 IL 126187, ¶ 66; *Green*, 2020 IL 125005, ¶¶ 24, 38. We are bound by decisions of our supreme court and have no authority to overrule or modify its decisions. *People ex rel. Department of Human Rights v. Oakridge Healthcare Center, LLC*, 2020 IL 124753, ¶ 30. As the facts of defendant's case do not fit within any of the three *per se* categories, which is where prejudice is presumed (see *Hernandez*, 231 Ill. 2d at 143), her argument that we should presume prejudice fails.

¶ 61    Moreover, the case law defendant relies on is no longer good law and has not been for decades. We begin with her reliance on *Norris*, 46 Ill. App. 3d at 542, where the appellate court held that, in light of the public defender's conflict of interest, the trial court erred when it denied the defendant's motion to withdraw his plea, and it remanded for the trial court to appoint counsel other than the public defender. The court reached this decision by looking to the "analogous situation of a post-conviction proceeding," where "our supreme court has recognized that an inherent conflict of interest confronts the public defender's office when an assistant charges that

---

The *Yost* decision narrowed the first category and modified *Hernandez*'s holding to recognize a *per se* conflict of interest only when the representation of the victim was contemporaneous with the representation of the defendant. *Yost*, 2021 IL 126187, ¶¶ 62-65.

another assistant incompetently represented the petitioner at trial." *Id.* at 541. The court reasoned that public defenders should not argue the inadequacy of themselves or their office and instead are under a duty to withdraw when such a circumstance arises. *Id.*

¶ 62    The premise that *Norris* relied on—that a public defender could not argue deficient representation by another member of the public defender's office—was rejected by our supreme court more than 35 years ago in *People v. Banks*, 121 Ill. 2d 36 (1987). The *Banks* court held that, "where an assistant public defender asserts that another assistant from the same office has rendered ineffective assistance, a case-by-case inquiry should be conducted to determine *** the presence of an actual conflict of interest." *Id.* at 44. In so holding, the *Banks* court explicitly overruled *People v. Smith*, 37 Ill. 2d 622 (1967), and *People v. Terry*, 46 Ill. 2d 75 (1970), both of which the *Norris* court had cited approvingly. Defendant's additional authority, *Willis*, 134 Ill. App. 3d at 129-30, followed the *Norris* holding, and *Williams*, 176 Ill. App. 3d at 79, followed both the *Norris* and *Willis* holdings.

¶ 63    Finally, we turn to defendant's argument that, even if prejudice is not presumed, counsel labored under an actual conflict of interest. To establish an actual conflict of interest, a defendant must identify an actual conflict of interest that adversely affected counsel's performance. *Yost*, 2021 IL 126187, ¶ 38. The defendant has to identify a specific deficiency in counsel's representation that is attributable to the alleged conflict; speculative allegations and conclusory statements are insufficient. *Id.*

¶ 64    When counsel raises the issue of counsel's own ineffectiveness, counsel has a duty to zealously represent the client in arguing that issue. *People v. Brown*, 2017 IL App (3d) 140921, ¶ 34; see also *Garcia*, 2018 IL App (5th) 150363, ¶ 47. In *Brown*, defense counsel's motion to set aside the defendant's guilty verdict was premised on counsel's ineffectiveness in failing to call

defense witnesses at trial. *Brown*, 2017 IL App (3d) 140921, ¶ 32. Instead of arguing either the deficiency or prejudice prongs of an ineffective-assistance claim, defense counsel "placed the blame on [the] defendant and a 'miscommunication.' " *Id.* ¶ 33.

¶ 65 Further, defense counsel in *Brown* failed to provide affidavits or other evidence that would have provided or described the expected testimony of the witnesses who were not called at trial. *Id.* The failure to include such evidence was fatal to the motion because it precluded a showing of prejudice. *Id.* The court therefore found an actual conflict of interest, and it vacated the trial court's order and remanded for the appointment of conflict-free counsel. *Id.* ¶¶ 33-34.

¶ 66 Similarly, in *Garcia*, defense counsel argued his own mistake that resulted in an unfair trial. *Garcia*, 2018 IL App (5th) 150363, ¶ 49. The alleged mistake, which was argued in a motion for a new trial, was the introduction of a video of the defendant's interrogation by police. *Id.* ¶ 20. Counsel explained that he had not objected to the video's admission because he " 'was certain that it was probably redacted' " and he was unsure of the entire contents of the video. *Id.* ¶ 21. The trial court resisted this notion, stating that it recalled that counsel had represented that he had reviewed the video and knew its contents. *Id.* Counsel responded that he thought the State would play certain parts for the jury and not the whole video. *Id.* The court offered counsel the opportunity to present evidence on his motion, but counsel declined, emphasizing that he was not " 'casting blame on anyone.' " *Id.* ¶¶ 22, 24.

¶ 67 In holding that the defendant was denied his right to conflict-free counsel, the *Garcia* court first noted that counsel was arguing that his own mistake had resulted in an unfair trial. *Id.* ¶ 49. The court reasoned that the record showed that counsel was reluctant to cast blame on anyone for his mistake and that counsel declined the trial court's request to present evidence on the matter, resulting in the dismissal of the posttrial motion. *Id.* Under these facts, the court was obligated to

vacate the denial of the defendant's posttrial motion and remand for the appointment of conflict-free counsel. *Id.*

¶ 68 Like the arguments made by the defense attorneys in *Brown* and *Garcia*, the substance of counsel's argument was that he provided ineffective assistance. That is, he argued that he provided defendant with incorrect legal advice and, absent his incorrect advice, defendant would not have accepted the State's offer of conditional discharge on a felony. Thus, the pertinent question is whether counsel's conflict of arguing his own ineffectiveness adversely affected his performance on defendant's motion to withdraw her plea or, in the alternative, "withdraw her acquiescence to the amended sentence entered into on April 1, 2022, and place her back into Mental Health Court."

¶ 69 Here, the record demonstrates that counsel's conflict affected his performance. Like the attorneys in *Brown* and *Garcia*, counsel was reluctant to cast blame on himself or anyone else. For instance, in defendant's motion to withdraw her plea, he deemphasized his role as counsel, using passive language such as "In addition to being misinformed about what her options were," instead of directly asserting that he provided her with the deficient advice. Even more telling, counsel argued at the hearing on the motion to withdraw that "I think she made that decision based on—I don't want to say bad advice, but on some faulty potential, I guess I would say." As such, counsel did not come across as the zealous advocate contemplated by the right to effective assistance of counsel (*Brown*, 2017 IL App (3d) 140921, ¶ 34), and his reluctance to shoulder blame is readily attributable to his conflict in arguing that his own representation was substandard.

¶ 70 Also like the attorneys in *Garcia* and *Brown*, counsel failed to include relevant evidence on defendant's motion to withdraw, to wit, the e-mail conversations he had with defendant. This failure was a specific deficiency in counsel's representation because his argument was predicated upon the e-mail conversations he had with defendant. He argued that, in those e-mail

conversations, he and defendant discussed her options leading up to her neutral discharge, and it was during those e-mail discussions that defendant decided to accept the State's offer of conditional discharge. Without a copy or at least a more substantial description of the contents of those e-mail conversations, it is impossible to know what advice counsel actually gave defendant and whether defendant accepted the State's offer because of any specific advice.

¶ 71    In sum, counsel's performance was adversely affected by his conflict because he was consistently reluctant to argue his fault in providing defendant with bad advice and he failed to provide important evidence of whether defendant relied on bad advice. We therefore hold that counsel was laboring under an actual conflict of interest when he argued defendant's motion to withdraw her guilty plea, and we vacate the trial court's denial of defendant's motion to withdraw her guilty plea.

¶ 72    We express no opinion on whether the advice that counsel provided defendant was incorrect or whether she relied on that advice. On remand, we direct the trial court to appoint conflict-free counsel for defendant, and counsel will have the opportunity to file a new post-plea motion.

¶ 73                                    III. CONCLUSION

¶ 74    For the reasons stated, we vacate the order of the De Kalb County circuit court denying defendant's motion to withdraw her guilty plea, and we remand for the appointment of conflict-free counsel and new postplea proceedings.

¶ 75    Order vacated; cause remanded with directions.

*People v. Salamie*, **2023 IL App (2d) 220312**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of De Kalb County, No. 19-CF-602; the Hon. Philip G. Montgomery, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Elena B. Penick, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Richard D. Amato, State's Attorney, of Sycamore (Patrick Delfino, Edward R. Psenicka, and Pamela S. Wells, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |